**LINN COUNTY, Iowa and Linn County Conservation Board, Plaintiffs-Appellants,**

v.

**William KINDRED, Bruce Weldon, Jr., Glenn Belden, Defendants,**

**and**

**Sophia G. Lewis, Executor of the Estate of C. Ira Lewis, Deceased, Defendant-Appellee.**

No. 83-1655.

Court of Appeals of Iowa.

June 25, 1985.

David A. Elderkin and David L. Baker of Elderkin, Pirnie, Von Lackum & Elderkin, Cedar Rapids, for plaintiffs-appellants.

Craig Kelinson, Asst. Co. Atty., for plaintiffs-appellants.

James C. Davis of Woodward, Davis & Rossi, Des Moines, for defendant-appellee.

Heard by OXBERGER, C.J., and DON-IELSON, and HAYDEN, JJ.

OXBERGER, Chief Judge.

Appellant Linn County and the Linn County Conservation Board appeal from the district court's holdings returning certain land to the grantor under a reversionary clause. We affirm.

In 1965 C. Ira Lewis deeded to the county for use by the conservation board undeveloped island property in Linn county that was accepted by the county and used thereafter as a wildlife refuge. Lewis retained a life estate and a possibility of reverter was created if the county failed to fulfill certain specific conditions including, *inter alia*, restrictions on hunting and trapping, posting of no hunting or trapping signs, prosecution of hunters or trappers apprehended on the property, and planting of walnut trees according to a planned program over the ten years following Lewis's death. In 1979 plaintiffs brought suit against persons alleged to have trespassed on the property and cut and removed timber. Lewis died later that year and his executor was made a defendant since another defendant claimed Lewis gave him permission to go on the land. The estate counterclaimed seeking to quiet title based on the reversionary interest it possessed.

Negotiations were undertaken involving various interested persons and entities, some of whom were not parties to the legal action. Plaintiffs unsuccessfully sought enforcement by the court of what was alleged by them to have been an agreement reached during the negotiations.

During trial all claims were dismissed except those of plaintiffs and the estate

against each other. Evidence was presented concerning the extent of plaintiffs' efforts to comply with conditions of the grant from Lewis. The trial court quieted title in the estate, finding that a reversion had occurred in 1971. The court placed emphasis in its findings that no survey or other attempt to establish boundaries had been made, rendering it difficult if not impossible to comply with conditions of the grant concerning sign placement, and plans for the property had not been developed. There was a lack of consistent maintenance and patrol of the area, and in 1971 Lewis filed affidavits expressing a belief that, at that time, reversion had occurred due to plaintiffs' failure to meet conditions of the grant.

Notice of appeal was filed by an assistant county attorney within the thirty days provided under Iowa R.App.P. 5(a), but, at that time, he allegedly had not been expressly authorized by either the county or the conservation board to take such action. The board subsequently amended its minutes to show it took action purporting to authorize the appeal. Defendant estate filed a motion to dismiss the appeal due to a lack of jurisdiction alleged to result from failure to obtain authorization for the appeal within the thirty-day appeal period. Justice Larson denied the motion.

On appeal, appellee, the Lewis estate, again contends this court is without jurisdiction to hear the appeal because there was no proper authorization of the appeal given to the county's attorney by the county or conservation board.

Appellant contends the settlement purportedly entered into by the parties should be enforced, and that the court erred in determining the interest given to the county had reverted.

### I. Jurisdiction

■ This court has jurisdiction over the appeal of the county. The amended minutes of the November 1983 conservation board meeting indicate authority was given to take the appeal. Even if it had not been expressly given at that time, a party may ratify the unauthorized acts of its attorney. 7A C.J.S. *Attorney and Client* § 187 (1980). The amendment to the meeting is clearly such a ratification.

### II. Enforcement of Settlement

The county contends letters exchanged between counsel for the estate Keith Mossman, and Assistant Linn County Attorney Craig Kelinson show a settlement was reached prior to trial and insist it should be enforced. The appellee makes reference to our review of the court's decision being at law, however, this case was tried in equity to enforce a settlement agreement and our review of such decisions is de novo. Iowa R.App.P. 4.

In the initial letter of April 15 to Kelinson, Mossman stated his clients suggested an agreement be reached that: (1) Linn County would dismiss the present lawsuit; (2) Eloise Dennis, a grandchild of C. Ira Lewis, and her husband would define the easement through their property for access to the preserve; (3) a lease for 105 acres upstream from the preserve, called the "Lewis access" area would be rewritten to eliminate the logging and other restrictions, or the property would be sold to Linn County; (4) a deed of the reversionary interest owned by the Lewis family would be given to the county; (5) claims by the Lewis family for farming which took place on the land would be released and an accounting would be made; and (6) claims for the logging of trees on the land would be released by the Lewis family. Mossman indicated his clients wanted the matters resolved and hoped the county would "accept this offer of settlement."

The next letter was dated April 21 and written from Kelinson to Mossman. He indicated certain documents would need to be executed "to effect the settlement agreement" and stated the following needed to be carried out before the suit was dismissed: (1) transfer a deed of the reversionary interest to Linn County; (2) settle boundary lines of the preserve; (3) execute an easement agreement for the area surveyed by Linn county or at another mutual-

ly agreeable site; (4) release the claims in connection with use of the property; (5) release claims regarding the lease; and (6) draft an agreement or letter of understanding to negotiate in good faith regarding the future of the lease.

Eloise Dennis visited with Kelinson at his office on May 7, 1982, and indicated she was upset that the suit had not yet been dismissed. She told her attorney that for this reason, along with the fact she and Kelinson were unable to resolve the remaining matters, she concluded no agreement had been reached.

Mossman indicated at the hearing that he thought an acceptance of the offer had been made, while at the same time admitting, "there were a number of things that had to be worked out." Among them was the fact the boundary line was not established, the location of the easement had not been established, and Mossman characterized item six as "an agreement to continue negotiating."

The county's attorney, Kelinson, believed a settlement had been reached but stated the agreement regarding the easement in the "package deal" was an offer "to enter into an agreement defining the easement." The situation regarding the lease was described by Kelinson as follows:

Q. Paragraph 6 does not say anything about either rewriting a lease or selling the 105 acres to Linn County, does it? A. It says that we agreed to negotiate in good faith concerning the future of that lease which while it does not say specifically that we would rewrite the lease or sell the property, the future of the lease obviously involves either selling the property or termination of the lease or rewriting the lease.

\* \* \* \* \* \*

Q. Isn't it a fact that your letter, Exhibit B, has neither an acceptance nor a rejection of Paragraph 3 or either of the proposals in it of Attorney Mossman's letter? A. It doesn't say that we agree to rewrite the lease or that we agree to sell the property, that's correct.

Appellant correctly states that when an offer of settlement is accepted the agreement can be specifically enforced. *Cunningham v. Iowa-Illinois Gas & Electric Co.*, 243 Iowa 1377, 1382, 55 N.W.2d 552, 555 (1952). However, as with any binding agreement, the settlement must be complete in itself and certain, while an agreement to agree at some point in the future is not binding. *See Shell Oil v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968); 15 A C.J.S. *Compromise & Settlement* § 4 (1967). The degree of certainty necessary has been discussed at *Palmer v. Albert*, 310 N.W.2d 169, 172 (Iowa 1981):

We have a number of cases supporting the principle that a contract must be definite and certain in order to be given legal effect. (cases omitted). However, this rule should not be carried to extreme lengths nor should it be used to defeat the intent of the parties. (Cites omitted). . . . Vagueness, indefiniteness, and uncertainty are matters of degree. (Cite omitted). Each case must be decided on its own particular circumstances.

In *Wickham & Burton Co. v. Farmer's Lumber Co.*, 189 Iowa 1183, 1185, 179 N.W. 417, 418 (1920), this appears: '[W]hatsoever is ascertainable with reasonable effort is sufficiently certain to be enforced ...' In *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977), we said: '[Contract] terms are sufficiently definite if the Court can determine with reasonable certainty the duty of each party and the conditions relative to performance.' Restatement (Second) of Contracts § 32(2) (Tent. drafts Nos. 1–7) (1973) states the rule this way: 'The terms of a contract are reasonably certain if they provide a basis for determining existence of a breach and for giving an appropriate remedy.'

We believe that here, using the principles set out above, the letters of correspondence between the parties are seen more accurately as negotiations rather than a firm settlement agreement. More than filling in names on documents and providing minor details remained to be done. The boundary lines were never established, instead the

parties agreed to agree on the matter in the future. The same is true of the easement dispute since it was not even determined where the easement would be placed. No reference is made in Kelinson's letter to Mossman's indication an accounting should be made of the farming on the land. The terms of the lease were never discussed and there is no indication of the dates and other specifics of the lease. Using the standards referred to in *Palmer*, it is clear no basis could exist for maintaining a suit for breach of any of the items; with no boundaries established it could not be determined if trespassing occurred, without terms of the lease there was no lease to enforce, without placement of the easement it could not yet exist. All the parties agree this was to be a package deal concerning the items listed, and yet major components of the agreement had not yet been negotiated. We believe the letters do not evidence a settlement agreement and instead reflect continuing negotiations between the parties.

### III. Reversion

The merits of the case were also tried in equity and the scope of review is de novo on this issue. Iowa R.App.P. 4. The question presented on appeal is whether the trial court correctly held that a reversion had occurred because of the county's breach of conditions of the deed.

The deed recited several requirements which, if not complied with, would result in a reversion of the interest. Among the conditions were the following:

2. No trapping or hunting in any manner whatsoever shall ever be permitted on any part of the above-described real estate or upon any land contiguous to any part or parcel of the above land now owned or hereafter acquired by grantee, and which had heretofore, or may hereafter, be turned over to the jurisdiction of the Linn County Conservation Board.

3. The Linn County Conservation Board shall post "No Hunting or Trapping" signs, or signs of similar import, in sufficient numbers and so lettered and colored, and so placed as to be legible from any point parallel with and fifty feet distant from the periphery of the above described land and from any point on all public highways, drives, or accesses along, through or into the premises in which hunting or trapping is to be prohibited, as provided in paragraph 2 above, and shall keep and maintain such signs in good, unweathered condition, and shall promptly replace, repair or repaint any such signs it discovers have been removed, damaged, obliterated, or become illegible. Said Board shall cause the places so posted to be patrolled at regular intervals (not less frequently than once each month) to effect performance of the foregoing obligations in respect to such signs and to make certain that such posting of all land referred to in paragraph 2 above is and continues to be effective. Said board shall cause all persons apprehended trapping or hunting in any manner on any part of the land referred to in paragraph 2 above to be prosecuted.

Without going into detail of the considerable evidence presented, we acknowledge the record is replete with instances of the county's violations of the deed requirements. Although patrol of the area was required at a minimum of once a month, conservation records show from 1969 to 1971 the area was visited only once. Witnesses testified to seeing hunting going on in the area over the years. The director of the conservation board admitted in a letter written July 10, 1973, "Hunting does take place in the area and I have not made a special effort to stop it." In a 1970 conservation department report it was noted, *"Restrictions:* No hunting or trapping—not necessary to meet original objectives and cannot be enforced in this area without large expenditures of time and money. Signs cannot be maintained due to floods." Although the deed required signs to be posted at certain intervals along the boundary of the preserve, no survey was undertaken to discover the boundaries of the area.

The county conservation board presents several excuses for its inaction. Appellants say it is "impossible" to enforce a hunting ban in the area, although an expert for appellees, an individual with a 25-year career with the conservation commission, testified the ban could be enforced with the proper manpower. The county said it was too expensive initially to survey the area, although the funds to conduct the survey were found after the lawsuit was commenced. The county also says its patrolling of the area and compliance with the deed has improved over the years. Nevertheless it is clear that for many years the deed conditions were not met and even now the requirements are frequently violated.

■ A number of other violations of the deed conditions have been cited by appellee, and we agree with the trial court that a reversion occurred because of failure to comply with the requirements. The county attempts to explain its action by pointing to a lack of funds and manpower. Yet, the county was well aware of the requirements when it accepted the deed. Numerous meetings between C. Ira Lewis and the county representatives and the policy statements regarding the preserve drafted by the county show the county knew what was expected of it if it were to accept the deed. If the requirements could not be met, the county should have so indicated and declined to accept.

We affirm the trial court's conclusion that a reversion occurred and quiet title in the heirs of the decedent.

AFFIRMED.