**SCHALLER TELEPHONE COMPANY, Plaintiff,**

v.

**GOLDEN SKY SYSTEMS, INC., Rodney A. Weary, and Jo Ellen Linn, Defendants.**

No. C 99–4101–MWB.

United States District Court, N.D. Iowa, Western Division.

April 23, 2001.

Alan E. Fredregill and Jeff W. Wright of Heidman, Redmond, Fredregill, Patter-son, Plaza, Dykstra & Prahl, L.L.P., Sioux City, IA, for Plaintiff.

William D. Beil (argued), Brooks A. Richardson of Rouse, Hendricks, German, May, P.C., Kansas City, MO, G. Daniel Gildemeister of Gildemeister & Keane, L.L.P., Sioux, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .......................................................1074
 A. Factual Background............................................1074
 B. Procedural Background .......................................1076

II. LEGAL ANALYSIS ...................................................1078
 A. Standards For Summary Judgment ........................1078
 B. Schaller's Breach–Of–Contract Claim ...................1079
 1. Applicable principles of Iowa contract law .........1080
 a. Existence and terms of an oral contract...........1080
 b. Negotiations and reduction to writing .............1081
 i. The Faught decision ...........................1081
 ii. Faught's precursors ..........................1083
 2. Did these negotiations ripen into an oral contract? .................1085
 a. Golden Sky's intent not to be bound except by a written agreement .................................1085
 b. Manifestations of assent to an oral contract ......1086
 i. Agreement to the "essential term" of price .......1087
 ii. Agreement on all terms ......................1089
 iii. Representations that the only contingency was board approval .................................1089
 iv. Other conduct suggesting an agreement had been reached .................................1090
 v. Weary's statements ..........................1091
 vi. Agreement to agree .........................1092
 vii. Scope of Golden's Sky's disclaimers ...........1092
 c. Consideration of other factors ....................1093
 C. Fraudulent Misrepresentation .............................1096
 1. The claim as pleaded and clarified in response to interrogatories....1098
 2. Merits of summary judgment on the claim as formulated .............1104
 a. Fraudulent misrepresentation under Iowa law ..................1104
 b. Misrepresentations of intention to perform .....................1106
 c. Other "misrepresentations" ....................1106
 D. Golden Sky's Counterclaim..................................1108

III. CONCLUSION ......................................................1108

In Greek mythology, Pegasus, the winged horse, was the mount of the hero Bellerophon when he rescued the kingdom of Lycia from the fire-breathing monster ChimÆra.[1] In this commercial litigation, plaintiff Schaller Telephone Company, disappointed by failure to close a deal to sell its satellite television assets to defendant Golden Sky Systems, Inc., was rescued from the full extent of any loss when Pegasus Communications Corporation bought Schaller's satellite television assets for over ten million dollars. Nevertheless, Schaller filed this suit against Golden Sky and two of its employees, alleging breach of an oral contract and asserting that Golden Sky's offer to buy its assets was a "chimera" of a different sort, because Golden Sky fraudulently misrepresented its intent and ability to perform the transaction. For its part, Golden Sky asserts a counterclaim of unjust enrichment arising from Schaller's failure to pay for satellite dishes that Golden Sky provided during the negotiation of the asset purchase agreement. Golden Sky now seeks summary judgment on both Schaller's claims and its own counterclaim. Following submission of a voluminous record and extensive arguments, written and oral, the court's task is to rule on Golden Sky's motion.

## I. INTRODUCTION

### A. Factual Background

This dispute arises from the parties' failure to close a deal for defendant Golden Sky Systems, Inc., to purchase plaintiff Schaller Telephone Company's exclusive rights to provide DirecTV satellite service to homes in Schaller's service territory. For the sake of convenience, the court will refer to the failed transaction between the parties as the purchase of Schaller's DBS ("direct broadcast satellite") assets. This summary of the factual background to the parties' dispute is by no means complete or detailed; rather, it is intended to provide only the background essential to put in context the parties' claims and counterclaims and Golden Sky's motion for summary judgment. Where necessary, the court will examine pertinent undisputed and disputed facts in more detail in the course of its legal analysis.

Schaller entered the DBS business in August of 1992, when it acquired from the National Rural Telecommunications Cooperative (NTRC) the rights to provide DBS programming services from DirecTV to cabled and non-cabled homes in Woodbury, Monona, Plymouth, and Ida Counties in Iowa. Golden Sky was formed in 1996 for the purpose of acquiring and owning distribution rights to DirecTV, and operating DirecTV programming services and equipment. Golden Sky's business strategy has been to expand its market through the acquisition of additional territories and the rapid increase of subscribers in those territories. In the fall of 1998, Golden Sky first expressed an interest in purchasing Schaller's DBS assets. The parties' negotiations of a possible purchase of Schaller's DBS assets by Golden Sky were long and complex. For background purposes, the court will touch only upon the principal landmarks in those negotiations.

1. *See, e.g.,* BULFINCH'S MYTHOLOGY 112–114 & 715 (Richard Martin, ed., HarperCollins, Inc., 1991). Bulfinch explains that Pegasus was "[t]he winged horse of the Muses, born of the sea foam and the blood of the slaughtered Medusa." *Id.* at 715. In addition to aiding Bellerophon in his defeat of the ChimÆra, Bulfinch recounts that "when Bellerophon attempted to ascend to heaven, he was thrown from the horse, and Pega[s]us mounted alone to the skies to become the constellation of the same name. When the Muses contended with the daughters of Pieros, Mount Helicon rose heavenward, Pegasus gave it a kick and brought out of the mountain the soul-inspiring waters of the fountain Hippocrene." *Id.*

The principal players in this drama are Steven Reimers, the President of Schaller Telephone Company, Steven R. Jensen, Schaller's attorney and principal negotiator on Schaller's behalf with regard to the Golden Sky transaction, Rodney A. Weary, the President and CEO of Golden Sky, Jo Ellen Linn, Golden Sky's General Counsel, LaQuita Jones, Golden Sky's Vice President for Acquisitions, and Ed Foster, outside counsel hired by Golden Sky to negotiate the transaction with Schaller. The parties agree that only Reimers and Weary had the authority to bind their respective parties by entering into a written agreement for the sale and purchase of Schaller's DBS assets.

After preliminary inquiries and the exchange of some information, on March 9, 1999, Golden Sky sent Schaller its first formal letter of interest making a conditional offer to purchase Schaller's DBS assets for $6,400,000 for a minimum of 3,200 subscribers, plus an additional $300 per subscriber in excess of 3,200. As a per subscriber deal, this offer was for a base price of $2,000 per subscriber. At about the same time, Golden Sky's main rival, Pegasus Communications Corporation, also made a somewhat better offer to purchase Schaller's DBS assets. Therefore, on May 26, 1999, Golden Sky sent Schaller a second letter of interest upping its offer. The May 26, 1999, letter made Schaller a conditional offer of $11,070,000 for a minimum of 4,100 subscribers, or $2,700 per subscriber, plus an additional $300 per subscriber in excess of 4,100. Although negotiation of numerous other issues began in earnest after this second letter of interest, the per subscriber price Golden Sky offered for Schaller's DBS assets remained at $2,700.

The parties' representatives held a meeting in Council Bluffs, Iowa, on June 30, 1999, to see if they could put together various details of a deal for the sale of Schaller's DBS assets to Golden Sky. Prior to that meeting, Steven Jensen, Schaller's attorney, requested and received a copy of a "standard form" of written asset purchase agreement typically used by Golden Sky from Golden Sky's outside counsel, Ed Foster. Jensen requested the "standard form" agreement so that he could get some indication of the terms that Golden Sky normally put in such agreements and to identify issues or concerns for Schaller.

One thing of interest to Schaller at this time was increasing its subscriber total to 5,000 or more to increase the purchase price for its DBS assets. Therefore, during the course of the meeting on June 30, 1999, in addition to other terms, the parties discussed a purchase price of $2,700 per subscriber for up to 5,000 subscribers, for a maximum total price of $13,500,000, with a reduction in purchase price of $2,700 per subscriber for every subscriber short of 5000.

During the course of the negotiations that followed, the parties exchanged several "blacklined" draft agreements, which need not be detailed here. However, after further negotiations, on July 23, 1999, Golden Sky sent Schaller a "Letter of Intent" to "confir[m] proposed terms under which Golden Sky Systems, Inc., . . . will acquire all of the assets, business and property from Schaller Telephone Company . . . for the provision of DIRECTV® programming services pursuant to NRTC/Member Agreement For Marketing and Distribution of DBS Services" in Schaller's service area. The Letter of Intent also expressed "the intention of the parties to begin immediate, good-faith negotiation between them of an 'Asset Purchase Agreement,'" subject to various terms and conditions as might be customary in the industry or agreed between the parties. The Letter of Intent indicated a "Base Purchase Price" of $13,500,000 for

not less than 5,000 active subscribers, with a reduction of $2,700 for each non-qualifying subscriber less than 5,000, and no increase for any subscribers over 5,000. Although Golden Sky's President, Rodney A. Weary, signed this Letter of Intent, no representative of Schaller ever signed or returned this letter as requested.

The negotiators for the parties met again in Kansas City, Missouri, on August 25, 1999, and made substantial progress in their negotiations. Golden Sky's Board of Directors approved the transaction on August 26, 1999, and authorized officers of the company to negotiate, execute, and deliver all necessary agreements to effect the deal. Schaller's Board of Directors took similar action on August 27, 1999.

On September 3, 1999, the principal negotiators for the parties participated in a conference call. During that call, Golden Sky's President, Rodney Weary, purportedly reiterated that Golden Sky intended to pay the price the parties had agreed upon. After that conference call, Golden Sky sent Schaller a draft letter memorializing what Golden Sky believed had been agreed to in principle. The draft letter includes reference to the parties' agreement that Golden Sky would provide Schaller with 288 Single LNB DBS systems on September 6, 1999, which the parties agree were intended to assist Schaller in its attempts to increase its number of subscribers. Schaller did indeed pick up these DBS systems from Golden Sky. Although Golden Sky requested that Schaller approve the statement of the agreement in principle, after which the letter would be signed by Golden Sky's President, Rodney Weary, Schaller did not respond and the letter was never signed. Instead, shortly after the September 3, 1999, meeting, Schaller contacted Pegasus Communications Corporation to see if Pegasus was interested in entering into negotiations to purchase Schaller's DBS assets for $14 million. No deal between Schaller and Pegasus was consummated at that time.

The exchanges of "blacklined" drafts of an Asset Purchase Agreement, which began during the summer, culminated in a "blacklined" draft dated September 21, 1999. Schaller contends that this draft embodies the parties' agreement on all essential terms of the transaction. However, neither the "blacklined" draft nor a "clean" copy of the September 21, 1999, agreement was ever signed by any representative of either of the parties and there is no record that either Weary or Reimers was ever presented with the September 21, 1999, agreement, in either a "blacklined" or "clean" form.

Instead, on September 23, 1999, by letter from Foster to Jensen, Golden Sky notified Schaller that it would not go forward with the transaction. Specifically, the letter stated that Golden Sky's "Board has decided to discontinue negotiations with Schaller under the proposed terms and conditions" after "consider[ing] the impact of recent changes in the credit and financial markets on the DBS industry."

Pegasus Communications Corporation, Golden Sky's primary rival, ultimately bought Golden Sky for just over $1 billion in a deal that was announced on January 5, 2000, and closed in May 2000. On March 14, 2000, Pegasus also acquired Schaller's DBS assets for $10,096,000, or approximately $2,000 per subscriber for 5,050 subscribers. Before either of those transactions took place, however, Schaller commenced this litigation against Golden Sky.

### B. Procedural Background

On October 15, 1999, Schaller filed suit against Golden Sky, its President, Rodney Weary, and its General Counsel, Jo Ellen Linn, in the Iowa District Court for Wood-

bury County, asserting claims of fraudulent misrepresentation, negligent misrepresentation, fraudulent nondisclosure, and breach of contract arising from collapse of the deal for Golden Sky to purchase Schaller's DBS assets. Golden Sky removed the action to this federal court on November 10, 1999. On December 17, 1999, Golden Sky simultaneously filed an Answer and Counterclaim to Schaller's Petition and a motion to dismiss. Golden Sky's counterclaim alleges unjust enrichment and seeks to recover $75,095 for satellite dishes it provided to Schaller for which Schaller has not paid. Golden Sky's motion to dismiss asserted, *inter alia*, that Schaller had not pleaded fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.

By order dated January 18, 2000, this court denied Golden Sky's motion to dismiss without prejudice, on the ground that Schaller's original state-court petition had not been subject to federal pleading rules and Iowa has no correlate to Federal Rule of Civil Procedure 9(b). The court's ruling on Golden Sky's motion to dismiss also noted that Schaller had filed a First Amended Complaint, which Golden Sky remained free to challenge.

Schaller's First Amended Complaint, filed January 3, 2000, again alleged fraudulent misrepresentation, negligent misrepresentation, fraudulent nondisclosure, and breach of contract. Schaller also filed a reply to Golden Sky's counterclaim on January 3, 2000. On January 18, 2000, Golden Sky again simultaneously filed an Answer and a motion to dismiss Counts II through IV of Schaller's First Amended Complaint.[2] Golden Sky did not, however, renew its challenge to the fraudulent misrepresentation claim as repleaded in the First Amended Complaint.

On July 18, 2000, this court entered an Order Regarding Defendants' Motion To Dismiss First Amended Complaint dismissing Counts II (negligent misrepresentation) and III (fraudulent nondisclosure) in their entirety and dismissing Count IV, Schaller's breach-of-contract claim, as to individual defendants Rodney Weary and Jo Ellen Linn. Following this ruling, Schaller's remaining claims are a claim of fraudulent misrepresentation, in Count I of Schaller's First Amended Complaint, and a claim of breach of contract against Golden Sky itself, in Count IV. Also still before the court is Golden Sky's counterclaim of unjust enrichment.

Following discovery, Golden Sky moved for summary judgment on January 5, 2001, seeking judgment in its favor on Schaller's remaining claims and its own counterclaim. On February 1, 2001, Schaller resisted Golden Sky's motion for summary judgment and, on February 15, 2001, filed an amended and substituted resistance. Schaller resists summary judgment on its claims of breach of contract and fraudulent misrepresentation, asserting that there are various genuine issues of material fact on these claims that must be resolved by a jury. Although Schaller acknowledges that it owes Golden Sky payment for the satellite dishes, Schaller contends that judgment on Golden Sky's counterclaim should be deferred as a set off against any damages Schaller may recover on its fraud and contract claims. Golden Sky filed a reply brief on February 12, 2001, and Schaller filed a surreply brief on March 12, 2001. The briefing of the parties on the issues presented was both excellent and extensive and was supported on each side by voluminous appendices of exhibits and transcripts of deposition excerpts.

---

2. Golden Sky was subsequently granted leave to amend its Answer to include the inadvertently omitted counterclaim.

The court heard oral arguments on Golden Sky's motion for summary judgment on April 16, 2001. At those arguments, plaintiff Schaller Telephone Company was represented by Alan E. Fredregill and Jeff W. Wright of Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, L.L.P., in Sioux City, Iowa. Defendant Golden Sky Systems, Inc., was represented by William D. Beil, who argued the motion, and Brooks A. Richardson of Rouse, Hendricks, German, May, P.C., in Kansas City, Missouri, and G. Daniel Gildemeister of Gildemeister & Keane, L.L.P., in Sioux City, Iowa. Like the briefing, the parties' oral arguments were excellent.

Following the oral arguments, the court took the unusual step of forecasting its ruling, in light of the short time remaining until trial is scheduled to begin on May 7, 2001. This opinion now provides the court's written ruling and rationale.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997);

*Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

Procedurally, the moving party, here Golden Sky, bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment, here Schaller, is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

With these standards in mind, the court turns to consideration of Golden Sky's motion for summary judgment on Schaller's claims of breach of contract and fraudulent misrepresentation and Golden Sky's own counterclaim of unjust enrichment.

### B. Schaller's Breach–Of–Contract Claim

Golden Sky first seeks summary judgment on Schaller's breach-of-contract claim. In Count IV of its First Amended Complaint, Schaller contends that Golden Sky agreed to purchase Schaller's rights to provide satellite television service to homes in Schaller's exclusive service area for the sum of $13,500,000, but that Golden Sky breached the parties' contract. First Amended Complaint, Count IV, ¶¶ 23–24. In its motion for summary judgment, Golden Sky contends that it is entitled to summary judgment on this claim, for the following reasons: (1) no oral agreement was formed, because the parties did not intend to be bound in the absence of a signed writing, and no such writing was ever executed; (2) the statute of frauds bars Schaller from establishing the existence of its alleged oral contract; and (3) the parties never gave mutual assent to definite terms of any contract. In response, Schaller contends that various fact questions preclude summary judgment on this claim, including whether or not mutual assent to all definitive terms was given by the par-

ties, and consequently whether all that remained to be done was to sign the agreement the parties had reached orally; whether or not the parties intended to be bound only by a final written and signed agreement; and whether or not promissory estoppel prevents the application of the statute of frauds to this contract. The court will consider these arguments for and against summary judgment on this claim, to the extent required, in more detail below.

### 1. Applicable principles of Iowa contract law

The court's consideration of the propriety of summary judgment on Schaller's breach-of-contract claim begins with a consideration of applicable principles of Iowa contract law concerning when an enforceable oral contract is formed.[3] The existence and terms of an oral contract, as well as whether the oral contract was breached, are ordinarily questions for the trier of fact. *See Audus v. Sabre Communications Corp.*, 554 N.W.2d 868, 871 (Iowa 1996); *Dallenbach v. Mapco Gas Prod., Inc.*, 459 N.W.2d 483, 486 (Iowa 1990); *Warfield v. Norwest Bank of Iowa, N.A.*, 2001 WL 246386, *2 (Iowa Ct.App. March 14, 2001); *Gallagher, Langlas & Gallagher v. Burco*, 587 N.W.2d 615, 617 (Iowa Ct. App.1998). However, the party asserting an oral contract must still generate a genuine issue of material fact on these issues to preclude summary judgment in the opposing party's favor. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492.

### a. Existence and terms of an oral contract

■ "In order to be bound, the contracting parties must manifest a mutual assent to the terms of the contract, and this assent usually is given through the offer and acceptance." *Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 331 (Iowa 1996) (citing *Hayne v. Cook*, 252 Iowa 1012, 1021, 109 N.W.2d 188, 192 (1961)); *see also In re: Guardianship and Conservatorship of Price*, 571 N.W.2d 214, 216 (Iowa Ct.App.1997) ("The only required elements [sic] of a binding contract are [sic] mutual assent to the contractual terms manifested by an offer and acceptance."). However, in order for a trier of fact to find that an oral contract existed, there must also be sufficient evidence of its terms to ascertain the duties and conditions established by the contract. *See Audus*, 554 N.W.2d at 871; *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 113 (Iowa 1991); *Warfield*, 2001 WL 246386 at *2; *Burco*, 587 N.W.2d at 617. In other words, for an oral contract to be found and to be held enforceable, the terms must be so definitely fixed that nothing remained except to reduce the terms to writing. *Price*, 571 N.W.2d at 216. Courts cannot find a contract where

**3.** In its opening brief in support of its motion for summary judgment, Golden Sky raised the question of whether Iowa or Missouri law should apply to the claims in this diversity action, which was removed from Iowa District Court to this federal court. Golden Sky argued that Iowa law should apply, if any true conflict of laws could be identified, as Iowa is the forum with the most significant relationship to the claims at issue. In an abundance of caution, however, Golden Sky also framed much of its argument in terms of identical principles of Iowa and Missouri contract law. In response, Schaller waived any choice-of-laws or conflict-of-laws questions by relying entirely on Iowa law as governing the substantive questions in this case.

none exists. *Audus,* 554 N.W.2d at 872; *In re Estate of Ohrt,* 516 N.W.2d 896, 901 (Iowa 1994); *Warfield,* 2001 WL 246386 at *2. Indeed, when the terms are not definite, courts are reluctant to impose even reasonable terms on contracting parties. *Burco,* 587 N.W.2d at 617 (citing *Bowser v. PMX Indus., Inc.,* 545 N.W.2d 898, 900 (Iowa Ct.App.1996)). However, where a contract does exist, courts are reluctant to hold that it is too uncertain to be enforceable. *Audus,* 554 N.W.2d at 872; *Ohrt,* 516 N.W.2d at 901; *Warfield,* 2001 WL 246386 at *2; *Burco,* 587 N.W.2d at 617.

### b. Negotiations and reduction to writing

■ An oral agreement may be enforceable, even if the parties intended to reduce it to writing, but never did so, if two conditions are met: (1) the agreement is complete as to its terms; and (2) the agreement is finally agreed to. *See Elkader Coop. Co. v. Matt,* 204 N.W.2d 873, 875 (Iowa 1973); *see also Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977); *Purina Mills, Inc. v. Bushman,* 2000 WL 1157836, *5 (Iowa Ct.App. Aug.16, 2000); *Davis v. Roberts,* 563 N.W.2d 16, 22 (Iowa Ct.App.1997); *Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp.,* 535 N.W.2d 149, 153–54 (Iowa Ct.App.1995). This is so, the Iowa Court of Appeals has explained, because in such circumstances, "[a]ny written version of the agreement would have merely served as an expression of an agreement already made." *Davis,* 563 N.W.2d at 22; *Employee Benefits Plus, Inc.,* 535 N.W.2d at 154. On the other hand, as the Iowa Supreme Court explained in *Faught v.*

*Budlong,* 540 N.W.2d 33 (Iowa 1995), and several prior decisions, there are circumstances in which no obligation will exist until the whole agreement of the parties has been reduced to written form. *See Faught,* 540 N.W.2d at 35–36.

■ These apparently contradictory possibilities frame the dispute in this case. Schaller contends that the terms for the purchase of its DBS assets were complete and finally agreed to orally, so that "[a]ny written version of the agreement would have merely served as an expression of an agreement already made." *Davis,* 563 N.W.2d at 22; *Employee Benefits Plus, Inc.,* 535 N.W.2d at 154. On the other hand, Golden Sky contends that the undisputed facts in the record demonstrate that, in the circumstances of this case, no obligation could exist until the whole agreement of the parties had been reduced to written form and the written agreement had been signed by the parties, which never happened. *See Faught,* 540 N.W.2d at 35–36. Therefore, the court must first focus on the question of when negotiations can ripen into an oral contract, even where a written agreement is contemplated, but never executed.

*i. The Faught decision.* In *Faught,* the Iowa Supreme Court examined this question in a case involving extensive negotiations to settle a mortgage dispute. *Faught,* 540 N.W.2d at 33. A jury returned a verdict finding an enforceable oral contract and breach of that contract, but the district court granted judgment notwithstanding the verdict. *Id.* at 35. The Iowa Supreme Court looked to comments to Section 27 of the RESTATEMENT (SECOND) OF CONTRACTS for guidance on the question of whether negotiations had ripened into an oral contract:[4]

---

**4.** The text of Section 27 of the RESTATEMENT (SECOND) OF CONTRACTS, which does not appear in the *Faught* decision, and consequently was not discussed directly in that decision, provides as follows:

Comments *a* and *b* to section 27 of the Restatement (Second) of Contracts pertinently provide:

a. Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract.

b. On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

*See also Continental Labs., Inc. v. Scott Paper Co.,* 759 F.Supp. 538, 540 (S.D.Iowa 1990) (citing with approval comment *b* ).

This court has embraced the principles enunciated in both comments:

### § 27. Existence of Contract Where Written Memorial Is Contemplated

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Thus, while § 27 recognizes the possibility that negotiations may ripen into an oral con-

It is generally held an oral agreement may be enforceable, even though the parties contemplate that it be reduced to writing and signed, if it is complete as to its terms and has been finally agreed to. Under such circumstances the writing is merely an expression of a contract already made. On the other hand, the parties may intend that obligation should arise only upon the signing of a written instrument embodying the terms they have tentatively agreed to.

*Elkader Coop. Co. v. Matt,* 204 N.W.2d 873, 875 (Iowa 1973) (citations omitted).

The Restatement also sets out the factors considered in determining whether a binding agreement has been reached:

Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

tract, even where the parties contemplate a written contract as the goal of the negotiations, this section also recognizes that whether or not this happens depends upon the circumstances of the case. Thus, § 27 merely framed the question presented in *Faught,* and now presented here, without providing an answer as to precisely *what* circumstances lead to an oral contract notwithstanding the parties' contemplation of a written agreement and what circumstances show that the oral agreements were merely preliminary negotiations.

Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

Restatement (Second) of Contracts § 27 cmt. *c* (1979). *See also Continental Labs., Inc.*, 759 F.Supp. at 541–42 (citing factors in comment c and finding as a matter of law based on these factors that defendant intended to be bound only by a written agreement signed by both parties; court therefore concluded no binding agreement ever existed and sustained defendant's motion for summary judgment); *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 421 (Iowa 1977) (citing most of the same factors).

*Faught*, 540 N.W.2d at 35–36.

**ii. Faught's precursors.** As the Iowa Supreme Court indicated in *Faught*, the Iowa Supreme Court had applied principles drawn from Comments *a* and *b* to Section 27 of the RESTATEMENT (SECOND) OF CONTRACTS in some of its prior cases, specifically, *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417 (Iowa 1977), and *Elkader Coop. Co. v. Matt*, 204 N.W.2d 873 (Iowa 1973). Additionally, this court finds that the Iowa Court of Appeals applied related principles, drawn from Section 26 of the RESTATEMENT (SECOND) OF CONTRACTS, in *Desy v. Rhue*, 462 N.W.2d 742 (Iowa Ct.App.1990). These decisions therefore warrant some further consideration.

In *Matt*, the earliest of these decisions, the Iowa Supreme Court considered whether an enforceable oral agreement for the sale and purchase of corn had been reached. *See Matt*, 204 N.W.2d at 874. Although the Iowa Supreme Court held that the appellant was entitled to a new trial, on the ground that the jury had not

been properly instructed, the court rejected the appellant's argument for a directed verdict that no enforceable oral agreement had been made, reasoning as follows:

It is generally held an oral agreement may be enforceable, even though the parties contemplate that it be reduced to writing and signed, if it is complete as to its terms and has been finally agreed to. Under such circumstances the writing is merely an expression of a contract already made. On the other hand, the parties may intend that obligation should arise only upon the signing of a written instrument embodying the terms they have tentatively agreed to. *Alpen v. Chapman*, 179 N.W.2d 585, 588, 589 (Iowa 1970); *Luse v. Waco Community School District*, 258 Iowa 1087, 1092, 141 N.W.2d 607, 610 (1966); Restatement, Contracts, section 26 (1932); 17 Am. Jur.2d, Contracts, sections 28, 29 (1964); 17 C.J.S. Contracts § 49 (1963).

*Matt*, 204 N.W.2d at 875.[5] Finding that "[t]he intention of the parties is decisive on this issue," and that "[t]his fact question is dependent upon all the circumstances present in the particular case," the court held that a jury question was presented on whether an oral agreement was to bind the parties. *Id.*

In *Severson*, a case which, like the one presently before this court, involved the purchase of assets of a business, the Iowa Supreme Court stated the rule in similar terms:

When the terms of an agreement are definitely fixed so that nothing remains except to reduce them to writing, an oral contract will be upheld *unless* the parties intended not to be bound until the agreement was reduced to writing.

---

**5.** Section 26 of the RESTATEMENT OF CONTRACTS, to which the Iowa Supreme Court pointed in *Matt* as one of the authorities for the principles articulated, is now Section 27 of the

RESTATEMENT (SECOND) OF CONTRACTS *See* RESTATEMENT (SECOND) OF CONTRACTS § 27, Reporter's Note.

*Marti v. Ludeking,* 193 Iowa 500, 503–504, 185 N.W. 476, 477–478 (1921). The terms are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance. *Janssen v. North Iowa Conference Pensions, Inc.,* 166 N.W.2d 901, 907 (Iowa 1969).

\* \* \* \* \* \*

Factors to be considered in seeking to ascertain whether the parties intended to be bound prior to execution of a written document include whether the contract is of a class usually found to be in writing, whether it is of a type needing a formal writing for its full expression, whether it has few or many details, whether the amount is large or small, whether the contract is common or unusual, whether all details have been agreed upon or some remain unresolved, and whether the negotiations show a writing was discussed or contemplated. *Emmons v. Ingebretson,* 279 F.Supp. 558, 572 (N.D.Iowa 1968).

*Severson,* 250 N.W.2d at 420–21 (emphasis added); *see also Bradley v. West Sioux Bd. of Educ.,* 510 N.W.2d 881, 884 (Iowa 1994) (citing *Severson* for the statement of the rule and pertinent factors); *Employee Benefits Plus, Inc.,* 535 N.W.2d at 154 (citing comparable factors for determining whether the parties intended an oral agreement to be binding prior to the execution of a written document drawn from *Severson,* 250 N.W.2d at 421); *H & W Motor Express v. Christ,* 516 N.W.2d 912, 914 (Iowa Ct.App.1994) (citing *Severson,* 250 N.W.2d at 420, for the statement of the rule). The factors identified by the court in Severson match those now stated in Comment *c* to RESTATEMENT (SECOND) OF CONTRACTS § 27. Applying these factors, the court in Severson concluded that the parties had reached an oral contract for the sale and purchase of the grain elevator in question. *Id.*

The Iowa Court of Appeals recognized a related principle drawn from present Section 26 of the RESTATEMENT (SECOND) OF CONTRACTS:

> Restatement (Second) of Contracts § 26 (1979), states a principle that we believe is well recognized in Iowa law:
>
> > A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person does not intend to conclude a bargain until he has made a further manifestation of assent.
>
> *In this case, it could not be clearer than is expressed in the proposed purchase agreement and by the conduct of the parties to the proposed contract that the parties did not intend to, or believe that they would, be bound until appellant had signed and the dealer had accepted.*

*Desy v. Rhue,* 462 N.W.2d 742, 746 (Iowa Ct.App.1990) (emphasis added). The facts making such a conclusion so clear included language in the purchase agreement stating "in bold capital letters that 'THIS AGREEMENT IS NOT BINDING UNTIL ACCEPTED BY THE SELLING DEALER OR HIS AUTHORIZED REPRESENTATIVE.'" *Id.* In a footnote, the Iowa Court of Appeals added the following observation:

> Were we to find that there had been agreement and that title had passed under these facts, we would be imposing much too heavy a burden on anyone who proposes to be bound by a contract. It is one thing for an agreement between two equally informed parties working together on preliminary matters to ripen into an enforceable contract, for which Appellees cite *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977); *it is quite another to impose a*

*contract when the supposed offeror has not seen the offer and both parties and the agreement itself indicate that there will be no binding contract until it is signed and finally accepted.*

*Desy,* 462 N.W.2d at 746 n. 2 (emphasis added).

Thus, these Iowa decisions considering the principles articulated in sections 26 and 27 of the RESTATEMENT (SECOND) OF CONTRACTS demonstrate that "[w]hether preliminary negotiations actually ripened into an oral contract depends on the intention of the parties as gleaned from the facts of the case." *H & W Motor Express,* 516 N.W.2d at 914 (citing *Severson,* 250 N.W.2d at 421); *Desy,* 462 N.W.2d at 746 (examining the language of the purchase agreement and the conduct of the parties).

### 2. Did these negotiations ripen into an oral contract?

Not surprisingly, in this case, Schaller contends that negotiations had ripened into an enforceable oral contract, as contemplated in comment *a* to RESTATEMENT (SECOND) OF CONTRACTS § 27, while Golden Sky contends that the undisputed facts demonstrate that a writing was required to conclude a contract for the purchase and sale of Schaller's DBS assets, as contemplated in comment *b* to § 27. To determine whether or not summary judgment is appropriate, or a fact question is instead presented, on the issue of whether this is a "Comment *a* case" or a "Comment *b* case," the court turns to an examination of the record.

### a. Golden Sky's intent not to be bound except by a written agreement

▆ The circumstances here are similar to those presented in *Desy v. Rhue,* 462 N.W.2d 742 (Iowa Ct.App.1990), in that "it could not be clearer than is expressed in [Golden Sky's written offers] and the conduct of the parties to the proposed contract that the parties did not intend to, or believe that they would, be bound until [Golden Sky] signed and [Schaller] accepted." *Desy,* 462 N.W.2d at 746. Indeed, Golden Sky's express statements that it would not be bound in the absence of a written agreement are even more categorical than the language of the purchase agreement in *Desy.* In *Desy,* the purchase agreement provided that "THIS AGREEMENT IS NOT BINDING UNTIL ACCEPTED BY THE SELLING DEALER OR HIS AUTHORIZED REPRESENTATIVE." *Id.* Here, more than written "acceptance" was required.

Instead, Golden Sky's two letters of interest, the first dated March 9, 1999, and the second dated May 26, 1999, both expressly state that the price offered is "conditional upon [a specified number of subscribers at closing] and *that the parties negotiate and execute a mutually acceptable purchase agreement* which would contain representations and warranties standard in the industry, and is subject to and conditioned upon obtaining the necessary required consents to a transaction, including but not limited to approval of NRTC, DIRECTV, and GSS' Board of Directors." *See* Appendix II—Document Exhibits In Support Of Defendants' Summary Judgment Motion (Defendants' Appendix II), Exhibits 5 (March 9, 1999, Initial Letter of Interest) at 1 (Bates 0001382) (emphasis added) & 8 (May 26, Second Letter of Interest) at 1 (Bates 00180); *see also* Defendants' Statement of Undisputed Facts, ¶ 19 & ¶ 24. Both also expressly state that "[t]here are many terms and conditions for sale which need to be agreed upon to finalize an agreement" and that "[y]ou should understand that this letter is not and is not intended to be, construed or relied upon as a commitment on the part of GSS. *Any commitment which we may subsequently determine to extend would be pursuant to the definitive documentation*

referred to above." *See* Defendants' Appendix, Exhibits 5 (March 9, 1999, Initial Letter of Interest) at 2 (Bates 0001383) (emphasis added) & 8 (May 26, Second Letter of Interest) at 2 (Bates 001581). Also, ¶ 2 of the Golden Sky's July 23, 1999, Letter of Intent indicates the parties' intention to *"begin* immediate, good faith *negotiation between them of an 'Asset Purchase Agreement,'* which will embody the terms and conditions contained herein and such other conditions, covenants, representations and warranties which may be agreed upon between the parties and as are customary in acquisitions of this type." *See* Defendants' Appendix II, Exhibit 16 (emphasis added); *see also* Defendants' Statement of Undisputed Facts, ¶ 91. Finally, the draft letter of September 3, 1999, which was intended to state Golden Sky's understanding of the agreement in principle reached during the telephone conference that day, stated that the letter was "not to be construed as an offer from GSS but is instead *intended to be a nonbinding expression of the parties' intentions with respect to entering into an asset purchase agreement memorializing the above-referenced transaction."* Defendants' Appendix II, Exhibit 84 (Draft Letter of September 3, 1999) at 2 (emphasis added); *see also* Defendants' Statement of Undisputed Facts, ¶ 165. These disclaimers make it abundantly clear that Golden Sky had no intention to be bound in the absence of a written agreement.

Moreover, Golden Sky contends that Schaller's representatives also understood that a written, executed agreement was required to complete a contract between the parties. Paragraphs 54 through 56 of Defendants' Statement of Undisputed Facts, which Schaller has admitted, *see* Plaintiff's Response To Defendants' Statement of Undisputed Facts, ¶¶ 54–56, state the following:

54. Jensen [who was counsel for Schaller during negotiations] thinks that he asked for a standard form written purchase agreement from Golden Sky [which he received June 28, 1999] "to get some indication of what Golden Sky typically puts into its agreements so we had some indication beforehand whether there was some things that were going to present problems for Schaller, or issues, and I felt that the easiest way to get to that was to, since they do a lot of these transactions, to get a standard type agreement, understanding that, obviously, it was going to be negotiated...." Ex. H, Jensen [Deposition] [p.] 43 [*l.*] 9[to][p.] 44 [*l.*] 23.

55. *Jensen anticipated that the standard form agreement would be the beginning point of negotiations over the contract documents that would effect the sale, and then he would have discussions with Golden Sky concerning the nitty gritty details of those written documents.* Ex. H, Jensen [Deposition] [p.] 44 [*l.*] 24[to] [p.] 45 [*l.*] 7.

56. After receiving Ex. 9, *Jensen understood that from that point forward, he would be negotiating with someone from Golden Sky about terms of a written asset purchase agreement.* Ex. H, Jensen [Deposition] [p.] 40 [*ll.*] 22–25.

Defendants' Statement of Undisputed Facts, ¶¶ 54–56 (emphasis added). Thus, there is no genuine issue of material fact that Schaller itself understood that Golden Sky expected to be bound only upon the signing of a written asset purchase agreement.

### b. *Manifestations of assent to an oral contract*

Schaller nevertheless argues that there are genuine issues of material fact as to Golden Sky's intent to be bound only by a written agreement that are generated by evidence that Golden Sky's representatives manifested assent to an oral agreement for the purchase of Schaller's DBS assets.

The court will consider whether any such "manifestations of assent" generate genuine issues of material fact on the question of Golden Sky's intent.

 ■ *i. Agreement to the "essential term" of price.* First, recognizing that a condition of a "Comment a case" is that the parties "agree upon all the terms which they plan to incorporate" in their agreement, *see* RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *a*, Schaller contends that the parties had agreed to the "essential term" of the contract, which Schaller contends was the price per subscriber. Schaller acknowledges that "[n]egotiations were initiated in earnest after Golden Sky submitted an offer to buy Schaller's DBS territory on May 26, 1999 at a rate of $2,700 per subscriber for 4,100 subscrib-

ers," citing the May 26, 1999, Second Letter of Interest, cited above. *See* Plaintiff's Amended And Substituted Resistance To Motion For Summary Judgment (Plaintiff's Amended Resistance) at 7 (citing Plaintiff's Exhibits In Support Of Resistance To Motion For Summary Judgment (Plaintiff's Exhibits), Exhibit 8, which is identical to Defendant's Appendix II, Exhibit 8).[6] However, Schaller contends that, on June 30, 1999, the parties agreed on the essential pricing structure for the deal as requiring Schaller to provide 5,000 subscribers to Golden Sky at the time of closing at $2,700 per subscriber, for a total purchase price of $13.5 million, with reductions in the purchase price of $2,700 for each subscriber short of 5,000 provided at closing. Schaller asserts further that these pricing terms never changed subse-

---

**6.** Neither party has complied precisely with N.D. IA. L.R. 56.1(e), which explains the requirements for the parties' appendices in support of and resistance to summary judgment. The court is able to overcome some deficiencies, such as the absence from the Defendants' Appendix of consecutive numbering "at the bottom center or bottom right-hand corner of each page," as required by the rule, where the defendants have tabbed and identified each exhibit or deposition excerpt, and have referred to supporting documents in a coherent manner, such that the court can readily navigate its way through the copious documents at issue in this case. However, the court is more frustrated by Schaller's submission of a set of Exhibits In Support Of Resistance To Summary Judgment that is largely duplicative of materials already submitted as part of the Defendants' Appendix. The applicable rule specifies that "[t]he resisting party's appendix must include those parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits *not already included in the moving party's appendix* upon which the resisting party relies in resisting the motion." N.D. IA. L.R. 56.1(e) (emphasis added). Because Schaller has consistently referred only to its own appendix when referring to documents that are duplicative of materials included in the Defendants' Appendix, the court must of necessity verify that the parties are in fact referring to the same documents. The court's frustration is somewhat ameliorated by the fact that the parties' duplicative exhibits generally, but not always, appear to be identically numbered.

 The cost of the parties' presentation of their arguments could have been substantially reduced, and the coherence of their arguments and the convenience of the court's review could have been substantially enhanced, by more careful compliance with the local rule concerning preparation of appendices in support of and resistance to summary judgment. Such rules are not imposed simply because the court feels a need to impose its authority or to dictate trifling requirements in the course of litigation. Instead, the requirements of the local rule are intended to enhance the coherence of the presentation of *the parties' case* to the court and to facilitate any subsequent review.

 In the future, the parties are cautioned to give greater care and attention to compliance with the requirements specified in the local rules regarding motion practice and in the Order Setting Trial, Final Pretrial Conference And Requirements For Final Pretrial Conference and the Final Pretrial Order itself, regarding trial preparation, so that presentation of a motion or case to the court or a jury may proceed as smoothly, efficiently, and coherently as possible.

quently. In support of its contention that the price term remained as agreed in June, Schaller cites deposition testimony by Steven Reimers, its President, *see* Plaintiff's Exhibits at 567 (Reimers Deposition, p. 82, *ll.* 3–72); deposition testimony of Steven Jensen, who negotiated on Schaller's behalf, *see* Plaintiff's Exhibits at 547–58 (p. 73, *l.* 9 to p. 74, *l.* 8); the September 3, 1999, draft letter by Golden Sky outlining the agreement in principle, as Golden Sky understood it, following the September 3, 1999, telephone conference, *see* Plaintiff's Exhibits at 20–21; *see also* Defendants' Appendix II, Exhibit 84 (Draft Letter of September 3, 1999); and the September 21, 1999, Draft Asset Purchase Agreement, *see* Plaintiff's Exhibits at 22–55.

Schaller relies heavily on the decision of the Iowa Court of Appeals in *In re Guardianship and Conservatorship of Price*, 571 N.W.2d 214 (Iowa Ct.App.1997), for the proposition that the oral agreement it contends existed was sufficiently definite to be enforceable, because the "essential" contract term, the price Golden Sky was to pay Schaller per subscriber, did not vary over the last several months of the negotiations. In *Price*, the court concluded that the parties had agreed to the "essential term" of the agreement where the evidence was uncontroverted that one party accepted payment of $400 per week to provide care and services for his parents, notwithstanding that party's contention that many terms of the caretaking agreement were left undecided. *See Price*, 571 N.W.2d at 216. The court reasoned as follows:

> While Steve argues many terms of the caretaking arrangement were left undecided, such as whether he would work as an independent contractor, the level of care needed, whether there would an be offset for rent, compensation for maintenance work, or determination of vacation time, "[a]n agreement need not contain definitely and specifically every fact in detail to which the parties may be agreeing." 17A Am.Jur.2d Contracts § 197 (1991). The agreement need only be "certain and unequivocal in its essential terms" and "absolute certainty is not required; only reasonable certainty is necessary." *Id.* § 196 (emphasis added). *The essential terms of $400 per week, in exchange for caretaking services, comprised the definite and essential term of the agreement. Steve cannot argue the level of care warranted by his parents was a term so vague that it could defeat the contract. From the onset, as evidenced by Colleen Eflin's September 1993 letter, the health care needs of the parents should have been apparent. Steve could have refused to begin or could have at any time discontinued the care by terminating the agreement. The parties' respective duties could be determined by a court with reasonable certainty.* See id. § 196 ("[T]he subject matter of the agreement must be expressed in such terms that it can be ascertained with reasonable certainty ... an agreement to be binding must be sufficiently definite to enable the court to determine its exact meaning and fix definitely the legal liability of the parties.").

*Price*, 571 N.W.2d at 216–17 (emphasis added).

Although *Price* may suggest a principle favorable to Schaller—that price may be the only essential term of a contract—the decision is inapplicable here for at least two reasons. First, *Price* involved a services contract, where the terms could be reasonably determined, and could be clarified during the course of performance, *see id.* (if the terms of the contract were unclear, "Steve could have refused to begin or could have at any time discontinued the care by terminating the agreement"), not a complex contract for the one-time sale and

purchase of assets of a going business. Second, in *Price*, a separate document, the prior caregiver's letter about the health care needs of the parents, should have made the duties of the party challenging the contract for indefiniteness readily apparent, *see id.*, but there is no such document in this case making it readily apparent what was involved in the transfer of Schaller's DBS assets. Moreover, each of Golden Sky's disclaimers identified myriad other terms that Golden Sky regarded as essential to the deal and required reduction of a deal incorporating agreement on all of these terms to writing. Thus, no reasonable jury could find that the oral agreement on which Schaller relies came into being on the basis that the only "essential term" of the contract was price, which had been agreed upon between the parties.

■ *ii. Agreement on all terms.* Similarly unavailing is Schaller's contention that the parties had agreed orally to *all* terms of the agreement, as embodied in the September 21, 1999, Draft Asset Purchase Agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *a* (the parties may reach an enforceable oral agreement, notwithstanding their intent to reduce the agreement to writing, if they "agree upon *all* the terms which they plan to incorporate" into their agreement) (emphasis added). Even if the September 21, 1999, Draft Asset Purchase Agreement included all of the terms of the transaction and the parties had agreed that all of those terms were acceptable—which Golden Sky disputes—there is no indication that Golden Sky's President, Rodney Weary, had seen that version of the Asset Purchase Agreement, and the record is undisputed that only Weary had the authority to bind Golden Sky to the transaction. *Cf. Desy*, 462 N.W.2d at 746 n. 2 (the offeror had not seen the offer). Thus, it would be inappropriate to impose a contract when the supposed offeror has not seen the version of

the agreement that the other party asserts embodies all terms of the agreement and the letters making initial offers and expressing intent to enter into the deal expressly state that there will be no deal until a written agreement is executed. *Cf. id.* (it would be wrong to "impose a contract when the supposed offeror has not seen the offer and both parties and the agreement itself indicate that there will be no binding contract until it is signed and finally accepted"); *see also Flanagan v. Consolidated Nutrition, L.C.*, 627 N.W.2d 573 (Iowa Ct.App.2001) (holding that the conduct of the parties demonstrated that they intended that they would not have a binding contract—for the sale and purchase of weaned pigs—until both had signed a written agreement that had been processed and approved by the defendant's personnel, because, after the plaintiff signed a proposed agreement, the parties exchanged further drafts with different terms).

■ *iii. Representations that the only contingency was board approval.* Schaller contends that on several occasions, Golden Sky's representatives suggested to Schaller that the only contingency in the transaction was that Golden Sky's board approve the deal, and that the board gave such approval on August 26, 1999. Jensen testified in deposition that Jo Ellen Linn, Golden Sky's General Counsel, who participated in the negotiations on Golden Sky's behalf, stated during a June 30, 1999, meeting that the "transaction" was "subject to board of director's approval," *see* Plaintiff's Exhibits at 552 (Jensen Deposition at 140, *ll.* 12–20); that Linn represented during the August 25, 1999, meeting in Kansas City that "Once the board approves it, we're ready to go," *see* Plaintiff's Exhibits at 553 (Jensen Deposition at p. 143, *ll.* 13–23 & p. 144, *ll.* 9–18); and that after board approval was obtained, Linn or

Foster left Jensen a voice mail congratulating him on the board's approval, *see* Plaintiff's Exhibit at 554 (Jensen Deposition at p. 148, *ll.* 10–20), which Schaller asserts indicates Golden Sky's recognition that the only contingency on the deal had been satisfied.

However, the court concludes that no reasonable inference arises that board approval was the *only* contingency for an enforceable agreement, when, pursuant to ¶ 13 of the July 23, 1999, Letter of Intent that Golden Sky sent Schaller, lack of board approval was only *one* of *three* contingencies that could lead to failure of the deal—the other two being "written consent" by the parties to terminate the transaction and failure to enter into "the Asset Purchase Agreement contemplated" by the parties by the deadline specified or by some agreed, extended deadline. *See* Defendants' Appendix II, Exhibit 16.[7] Also, as explained above, pursuant to ¶ 2 of that same Letter of Intent, the parties agreed to "begin immediate, good faith negotiation between them of an 'Asset Purchase Agreement,' which will embody the terms and conditions contained herein" and additional terms, *see id.*, thus expressly stating that there were other "contingencies" besides board approval. Moreover, the March 9, 1999, and May 26, 1999, letters of interest identified numerous contingencies in addition to board approval, including "obtaining the necessary required consents to a transaction, including

but not limited to approval of NRTC, DIRECTV, *and* GSS' Board of Directors." *See* Defendants' Appendix II, Exhibits 5 & 8. No reasonable jury could conclude, in light of this evidence, that the only contingency for the transaction was approval by Golden Sky's board of directors.

■ *iv. Other conduct suggesting an agreement had been reached.* Similarly unavailing are Schaller's attempts to generate a genuine issue of material fact that Golden Sky manifested assent to be bound by an oral agreement based on various conduct of Golden Sky's representatives. Schaller relies on Ed Foster's statements, following board approval of the transaction, that no signed, written agreement was required for purposes of securing bank financing, only a draft agreement setting forth the basic elements of the parties' agreement, as suggesting that Golden Sky had assented to an oral agreement in the absence of a writing. *See* Plaintiff's Exhibits at 554–55 (Jensen Deposition at p. 149, *l.* 1 to p. 150 *l.* 5). Simply put, however, no reasonable inference about *what Golden Sky required* to consummate the transaction arises from what a third party, such as a bank financing the transaction, required as documentation on which to prepare financing. Moreover, Schaller has pointed to nothing in the record indicating that the bank would ultimately have provided financing in the absence of a signed written agree-

---

7. Specifically, the Letter of Intent provides as follows:

> 13. This Letter of Intent may be terminated and the transactions contemplated by this Letter of Intent may be abandoned with no further obligation on the part of either party, at any time prior to Closing:
> a. by the written consent of Seller and Buyer, or
> b. by Buyer or Seller if the Asset Purchase Agreement contemplated herein is not entered into between the parties hereto by close of business on August 16, 1999,

> and no extension of such deadline is agreed to in writing by the Buyer and Seller, or
> c. by Buyer if the transaction is not approved by its Board of Directors.
> 14. Except for the obligations stated in Sections 2, 8, 10, 11, 12, 13 and this Section 14, this Letter of Intent is a non-binding expression of the parties' intention and neither party shall have any liability to the other with respect thereto....

*Id.* at ¶¶ 13–14; *see also* Defendants' Statement of Undisputed Facts, ¶ 94.

ment closing the transaction. Banks routinely prepare financing documents in advance of "closing" on the underlying transaction.

Nor do internal documents, prepared by Golden Sky in August of 1999, indicating that the transaction with Schaller was categorized under "BIDS ACCEPTED" and that the transaction was rated as a "100% Probability," manifest assent to be bound by an oral agreement or indicate, as Schaller argues, that Golden Sky believed a deal had already been reached. *See* Plaintiff's Exhibits at 619. Rather, the only reasonable inference arising from such documents is an inference that Golden Sky understood Schaller had accepted its "bid" at $2,700 per subscriber and that Golden Sky anticipated successful negotiations of all terms of the transaction to close the deal, *as specified in its letters of interest and Letter of Intent.* Similarly, e-mail exchanges between Jo Ellen Linn and LaQuita Allen dated August 12, 1999, indicating that these two representatives of Golden Sky were making hotel and plane reservations for a trip to Hawaii to close the Schaller transaction, *see* Plaintiff's Exhibits at 621–22, support no reasonable inference beyond a high degree of belief by these persons that the Schaller transaction would ultimately *close*, not an inference that these persons believed that Golden Sky had reached or assented to an enforceable oral contract.

■ *v. Weary's statements.* Finally, Schaller relies on representations attributed to Rodney Weary, President and CEO of Golden Sky, during the September 3, 1999, conference call to the effect that "We're going to keep this agreement," "We're going to buy your assets," and "I'm a man of my word and we will pay the price agreed. We intend to go forward with your transaction." *See* Plaintiff's Exhibits at 555 (Jensen Deposition at p. 152, *ll.* 2–8).[8] Schaller contends that Weary's statements manifest—if not expressly state—an intention to be bound to the terms agreed upon.

Assuming that Weary made the statements—and Golden Sky disputes that he did, *compare* Plaintiff's Statement Of Additional Material Facts In Opposition To Motion For Summary Judgment, ¶ 15, *with* Defendants' Supplemental Reply To Plaintiff's Supplemental Statement Of Additional Facts, ¶ 15—the statements still do not give rise to a genuine issue of material fact that Golden Sky intended to be bound in the absence of a signed written agreement, again even assuming that all terms had been agreed to during the course of the September 3, 1999, meeting, which Golden Sky also disputes. This is so, because, as explained above, the statements were made in the context of express statements in the first and second letters of interest and the Letter of Intent that Golden Sky would not be bound in the absence of a written agreement. Nothing in Weary's statement indicates an intent to waive the requirement of a written agreement previously *expressly* imposed upon Golden Sky's offers and negotiations.

8. As pleaded in Schaller's First Amended Complaint, Weary's statements were "Done, it's a deal. I am a man of my word and we intend to pay the price agreed." *See* First Amended Complaint, ¶ 15. However, Schaller was apparently unable to find any record evidence supporting such a characterization of Weary's statements. Instead, the statements, as characterized in the testimony of Steven Jensen, appear in the body of this decision. Moreover, Golden Sky contends that the only reasonable inference that arises from Weary's statements, if made either as pleaded or as later characterized in Jensen's testimony, is that Weary was reaffirming agreement to *one term* of the parties' agreement, the price term, not assenting to an oral contract for the purchase of Schaller's DBS assets.

The present circumstances are also distinguishable from those in *Severson* in which the Iowa Supreme Court held that an enforceable oral contract had been reached for the purchase of the assets of a business, even though *Severson* also involved statements by the principal of one of the parties to the transaction that were described as manifesting assent to the transaction. *See Severson,* 250 N.W.2d at 421. In *Severson,* the defendant seller of the business told the plaintiff, "Well, you have just bought an elevator." *Id.* In the case of Weary's purported statements, however, the statements are cast in terms of an *intention* to complete the transaction, not in terms of the other party having *already* or *just* done so—even as characterized by Schaller's representative, Weary's statement was that Golden Sky was *going to* or *would* buy Schaller's DBS assets, not that Golden Sky *had* done so. *See* Plaintiff's Exhibits at 555 (Jensen Deposition at p. 152, *ll.* 2–8) (Weary purportedly said, "We're *going* to keep this agreement," "We're *going* to buy your assets," and "I'm a man of my word and we *will pay* the price agreed. We *intend to go forward* with your transaction.") (emphasis added). Also, in *Severson,* there is no indication that the party asserting that no oral agreement existed could point to evidence, like that presented here, in the form of language of the initial offers and the Letter of Intent, that specified that a written agreement was *required* to close the deal. *See* Defendants' Appendix, Exhibits 5 (March 9, 1999, Initial Letter of Interest) at 1–2 & 8 (May 26, Second Letter of Interest) at 1–2; Defendants' Appendix II, Exhibit 16 (Golden Sky's July 23, 1999, Letter of Intent) at ¶ 2. While the court in *Severson* "recognize[d] a prudent businessman might have demanded additional terms and that the terms be spelled out with more precision," before a deal was made, but did not, *see Severson,* 250 N.W.2d at 421, Golden Sky specified *with*

*its initial letter of interest,* as well as in its second letter of interest and Letter of Intent, numerous matters that were essential to the transaction. *See* Defendants' Appendix, Exhibits 5 (March 9, 1999, Initial Letter of Interest) & 8 (May 26, Second Letter of Interest); Defendants' Appendix II, Exhibit 16 (Golden Sky's July 23, 1999, Letter of Intent).

*vi. Agreement to agree.* To put it another way, Schaller's evidence gives rise to a reasonable inference of no more than "an agreement to agree," which "is not a contract." *Whalen v. Connelly,* 545 N.W.2d 284, 293 (Iowa 1996); *H & W Motor Express,* 516 N.W.2d at 914 ("An agreement to agree at some point in the future is not binding.") (citing *Linn County v. Kindred,* 373 N.W.2d 147, 150 (Iowa Ct.App.1985)). As the Iowa Supreme Court explained in *Whalen,*

> A contract is ... generally not found to exist when the parties agree to a contract on a basis to be settled in the future. *Air Host Cedar Rapids v. Airport Comm'n,* 464 N.W.2d 450, 453 (Iowa 1990). In other words an agreement to agree is not a contract.

*Whalen,* 545 N.W.2d at 293. Here, the record of the negotiations of the asset purchase, which indicates agreement on price and agreement to the incorporation of various terms into a final agreement, shows only that the parties "agree[d] to a contract on a basis to be settled in the future." *Id.* As in *Whalen,* therefore, judgment as a matter of law is appropriate on the issue of breach of an oral contract. *Id.* (the trial court properly granted a directed verdict on the issue of breach of an oral contract).

■ *vii. Scope of Golden Sky's disclaimers.* As a last ditch effort to overcome the impact of Golden Sky's disclaimers, Schaller contends that the disclaimers refer only to the letters themselves and

not to the oral representations made by Golden Sky indicating an intention to be bound prior to execution of a signed writing. This argument misconstrues the language of the disclaimers, which, as a matter of law, applies to the entirety of the negotiation process. *Cf. Desy,* 462 N.W.2d at 746 (concluding that directed verdict should be entered that no oral agreement had been reached, on the basis of the written disclaimer of intent to be bound in the absence of a writing signed by the buyer and accepted by the seller).

In both the March 9, 1999, initial letter of interest and the May 26, 1999, second letter of interest, Golden Sky made clear that the price offered was "conditional upon [a specified number of subscribers] at closing and that the parties *negotiate* and execute a mutually acceptable purchase agreement...." and both letters specify that *"[a]ny commitment which we may subsequently determine to extend would be pursuant to the definitive documentation referred to above."* Defendants' Appendix II, Exhibits 5 & 8 (emphasis added). Similarly, the language of the July 23, 1999, Letter of Interest expressly states "the intention of the parties to *begin immediate, good faith negotiation* between them of an 'Asset Purchase Agreement,'" with certain conditions, and specifies that the Letter of Intent, *i.e.,* the parties' intention to enter into any agreement for the sale of Schaller's DBS assets, would be terminated "by Buyer or Seller if the Asset Purchase Agreement contemplated herein is not entered into between the parties" by the deadline specified or as extended. Defendant's Appendix II, Exhibit 16, ¶¶ 2 & 13. Furthermore, the draft letter of September 3, 1999, memorializing the agreement in principle, states that it must "not to be construed as an offer from GSS but is instead intended to be a nonbinding expression of the parties' intentions with respect to entering into an asset purchase agreement memorializing the above-refer-

enced transaction." Defendants' Appendix II, Exhibit 84 (Draft Letter of September 3, 1999) at 2. Thus, the language of the disclaimers expressly encompasses the *entire* negotiation process, creating an "umbrella" requirement of a signed writing to make a contract, thereby making clear that any agreement on individual terms or even *all* of the terms of the agreement would not result in a binding contract in the absence of an executed writing.

The effect of such disclaimers is that summary judgment in favor of Golden Sky must be granted on Schaller's claim of breach of an oral contract, because, as a matter of law, no oral contract could exist in the circumstances presented.

### c. Consideration of other factors

■ Although the court concludes that effective disclaimers of any intent to be bound in the absence of a written agreement dictate summary judgment in favor of Golden Sky on Schaller's claim of breach of contract, the court will nevertheless consider the other factors identified by Iowa courts as pertinent to the determination of whether negotiations have ripened into an oral contract, even where the parties contemplate a written agreement. *See Faught,* 540 N.W.2d at 36; *Severson,* 250 N.W.2d at 421; *see also Bradley,* 510 N.W.2d at 884 (citing *Severson* for the statement of the rule and pertinent factors); *Employee Benefits Plus, Inc.,* 535 N.W.2d at 154 (citing comparable factors for determining whether the parties intended an oral agreement to be binding prior to the execution of a written document drawn from *Severson,* 250 N.W.2d at 421); RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *c.*

In *Faught,* the Iowa Supreme Court concluded that, as a matter of law, the parties never reached a binding agreement over the course of their extensive negotia-

tions to settle a mortgage dispute. *See Faught,* 540 N.W.2d at 38. First, the Iowa Supreme Court found that the plaintiffs "knew the bank never intended an obligation would exist until terms other than the ones mentioned in the various proposals and counterproposals were agreed to." *Id.* Second, an unsigned agreement contemplated additional material terms. *Id.* For example, although not mentioned in the various proposals and counterproposals, the court concluded that a "marketable title requirement would be an expected provision in any agreement to sell and convey land," and that the plaintiffs' attorney had negotiated similar transactions involving a marketable title requirement. *Id.* at 39. The court also found that the plaintiffs could reasonably expect a general release running to the bank and a homestead waiver as part of any formal agreement. *Id.* at 39–40. Here, in light of Golden Sky's written disclaimers in its letters of interest and Letter of Intent, Schaller also knew that Golden Sky never intended that an obligation would exist until various terms besides price were negotiated and agreed and the entire agreement was reduced to an executed, written agreement. *See id.* at 38. Golden Sky's letters of interest and Letters of Intent and all of the draft agreements exchanged between the parties contemplated additional material terms besides price. *See id.* In addition to terms expressly identified by Golden Sky, the parties should reasonably have expected additional terms, such as agreement on the definition of qualifying "subscribers" for the determination of the final purchase price, based on price per subscriber, and indeed the parties conducted extensive negotiations on this specific issue. *See id.* at 39–40.

Moreover, in *Faught,* the court concluded that "[o]ther factors"—some recognizable as factors drawn from RESTATEMENT (SECOND) OF CONTRACTS § 27, Comment *c,* although not so cited by the court—supported the conclusion that no binding agreement was ever reached:

> *The issues the parties were dealing with were complex. The amount of money involved—$130,000—was relatively large. The bank used a settlement agreement that was a standard document with several boiler plate provisions. The agreement dealt with a number of matters. Any reasonable person would expect that such an agreement would usually be put in writing.* The parties negotiated from June until September and exchanged several letters, telephone calls, written proposals and counterproposals. The status of the bank, the regulations it was subject to, and good banking practices dictated that all significant business agreements be in writing.

> *It is significant that the parties continued to correspond in writing and by telephone well beyond the date the Faughts claim an agreement was reached. These continued negotiations belie the prior existence of a final binding agreement as the Faughts contend.*

> *Nelsen's unsigned agreement and the bank's final draft contain a similar provision: all modifications, alterations, or amendments would require a writing signed by the parties. Certainly, the parties would not insist on such a requirement without first contemplating that no binding obligation would arise until both parties signed a written agreement.*

On September 17—about a week after the parties reached an impasse—Gary Faught wrote his congressman complaining about the bank's treatment of him. In that letter Faught described how the parties came to the impasse: "We had just turned down their counteroffer that morning and canceled our request for CRP participation that af-

ternoon." The counteroffer Faught is referring to is the bank's final revised agreement. Later in the letter, Faught wrote: "On September 9 they turned down an offer that increased the equity in this 160–acre farm by $40,000."

Gary Faught has a master's degree from Cornell University. He is a businessman and a teacher. His testimony clearly establishes that he is well-versed in such terms as offer, acceptance, and counteroffer in contract parlance. The letter is in close proximity to the September 9 impasse and demonstrates that Gary Faught believed the parties had not reached a binding agreement.

*Given the length of negotiations, the proposals and counterproposals, and the distrust between the parties, reasonable minds could only conclude that both parties contemplated a written and signed agreement before either would be bound. The parties' prior dealings were simply preliminary negotiations and expressions of terms to be formally memorialized in a written agreement executed by the parties.*

*Faught,* 540 N.W.2d at 40 (emphasis added). In these circumstances, the Iowa Supreme Court concluded that, as a matter of law, the parties never reached a binding agreement, and therefore affirmed the district court's grant of judgment notwithstanding the verdict. *Id.* Schaller contends that the applicable factors considered in light of the circumstances in *Faught* made that case a "Comment *b* case," but application of the same factors here make this a "Comment *a* case." The court does not agree.

Schaller contends that express, albeit oral, agreement had been reached on all terms to be included in the agreement, as embodied in the September 21, 1999, Draft Purchase Agreement, and Golden Sky does not plainly dispute that contention. *See Faught,* 540 N.W.2d at 36 (citing ex-

tent of agreement to terms as one factor) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt *c.*). However, Schaller admits that the type of contract in question here is usually in writing and that the amount of the transaction is large. *See* Plaintiff's Amended Resistance at 6; *see also Faught,* 540 N.W.2d at 36 ("The issues the parties were dealing with were complex. The amount of money involved—$130,000—was relatively large.... Any reasonable person would expect that such an agreement would usually be put in writing."). Moreover, it cannot reasonably be disputed that the transaction involved myriad details, as evidenced both by Golden Sky's disclaimers and the course of the parties' negotiations, however much Schaller would like to focus on price as the "essential term." *See Faught,* 540 N.W.2d at 36 ("The agreement dealt with a number of matters."). Although the parties both recognized that "standard form" contracts were available, both also recognized that the transaction in question would require extensive negotiation. *See* Defendants' Appendix II, Exhibits 5 & 8 (Golden Sky's letters of interest indicating that "[t]here are many terms and conditions for sale which would need to be agreed upon to finalize an agreement"); Defendants' Statement of Undisputed Facts, ¶¶ 54–56 (Jensen's recognition that the transaction required extensive negotiation, even if the parties began with Golden Sky's "standard form" of written agreement for such acquisitions); Plaintiff's Response To Defendants' Statement of Undisputed Facts, ¶¶ 54–56 (admitting ¶¶ 54–56 of Defendants' Statement of Undisputed Facts), *and compare Faught,* 540 N.W.2d at 36 ("The bank used a settlement agreement that was a standard document with several boiler plate provisions [but] continued negotiations belie the prior existence of a final binding agreement...."). Moreover, as deter-

mined above, based on Golden Sky's letters of interest and Letter of Intent, the transaction in question here " 'needs a formal writing for its full expression.' " *See Faught*, 540 N.W.2d at 36 (quoting comment *c*, and concluding, from various factors, that "[a]ny reasonable person would expect that such an agreement would usually be put in writing"). These factors thus weigh in favor of the conclusion that a writing was required. *Faught*, 540 N.W.2d at 36.

Nor can the court conclude, on the basis of the remaining factor, whether either party took any action in preparation for performance during the negotiations, *id.* (quoting comment *c* ), that Schaller has generated a genuine issue of material fact as to whether or not a writing was required. Schaller suggests that it took various actions in reliance on a purported agreement, but those actions were in the nature of enhancing its subscriber base, which enured to its own benefit as well, if it retained the assets, not actions indicative only of an agreement to part with control of its DBS assets. *Compare Severson*, 250 N.W.2d at 420–21 (the defendant notified his elevator manager that he was selling the elevator and that the manager would not be employed by the new owner).

Thus, upon consideration of all applicable factors, the court concludes that "reasonable minds could only conclude that both parties contemplated a written and signed agreement before either would be bound." *See Faught*, 540 N.W.2d at 39–40 (concluding, as a matter of law based on the applicable factors, that a written agreement was required and that "[t]he parties' prior dealings were simply preliminary negotiations and expressions of terms to be formally memorialized in a written agreement executed by the parties"); Restatement (Second) of Contracts § 26 & § 27, cmt. *b*. Summary judgment will therefore be entered in favor of Golden

Sky on Schaller's claim of breach of an oral contract.

### C. Fraudulent Misrepresentation

Golden Sky also seeks summary judgment on Schaller's other remaining claim, Schaller's claim of fraudulent misrepresentation. Golden Sky contends that Schaller's fraud claim, as pleaded and clarified in response to pertinent interrogatories, alleges that Golden Sky misrepresented its intention to purchase Schaller's DBS assets. Consequently, Golden Sky contends that the "misrepresentations" on which the claim is based are also the terms of the purported oral contract and that, as a matter of law, breach of contract cannot be cloaked as "fraud" and made a separate cause of action. More specifically, Golden Sky contends that Schaller is attempting to assert that, if the representations at issue did not create a contract, they were fraudulent misrepresentations of intention to enter into a contract, but a plaintiff cannot sue for an alleged fraudulent representation if the representation was at the heart of the alleged contractual agreement, not collateral or extraneous to the terms of the contract. Thus, Golden Sky contends that it is entitled to summary judgment on Schaller's fraud claim on the ground that the claim is duplicative or redundant of Schaller's contract claim. Additionally, Golden Sky contends that there is no evidence showing that the alleged misrepresentations were false at the time they were made, that Golden Sky had any intent to deceive Schaller about its intention to purchase Schaller's DBS assets, or that Schaller justifiably relied to its detriment on any of the misrepresentations alleged.

Schaller responds that Golden Sky is relying on a "New York rule," peculiar to the law of that state, when Golden Sky contends that no fraud claim will lie when the representations at issue are at the heart of the contract. Schaller contends

that Iowa law is to the contrary, because Iowa law recognizes that representations about intent to perform future acts are actionable as fraud if there was no intent at the time the representation was made to fulfill the representation. Schaller contends that there are genuine issues of material fact as to the falsity of Golden Sky's representations of its intent to purchase Schaller's DBS assets, Golden Sky's knowledge of the falsity of those representations, and Schaller's reliance on those representations. Moreover, Schaller contends that its fraud claim is not based solely on Golden Sky's misrepresentation of its *intention* to purchase Schaller's DBS assets, but is also premised on Golden Sky's misrepresentation of its *ability* to perform the transaction. Schaller contends that there is copious evidence that Golden Sky knew that it could not afford or finance the purchase of Schaller's DBS assets at the time it expressed an intention to do so, because Golden Sky knew that its financial situation was precarious and that it was already in violation of various loan covenants, which would make financing of the deal with Schaller impossible, as well as copious evidence of Schaller's reliance, to its cost, on Golden Sky's ability to perform the purchase of assets.

In reply, Golden Sky contends that Schaller's claim of misrepresentation of *ability* to perform the transaction at issue is "newly minted," because it was never pleaded and was never identified as a basis for Schaller's fraud claim in response to pertinent interrogatories. Furthermore, Golden Sky contends that the claim of misrepresentation of ability to perform the transaction is simply an attempt to redress the fraudulent non-disclosure claim this court has already dismissed. However, assuming, without admitting, that such a fraud claim is allowable, Golden Sky contends that it is still entitled to summary judgment on such a claim, because it made no representations at all of its ability to

perform the transaction, and if such representations were made, there is no evidence giving rise to a reasonable inference of the falsity of the representations or Golden Sky's knowledge of such falsity at the time the representations were made, nor is there any evidence of Schaller's reliance on such representations. As to the "original" fraud claim based on misrepresentation of *intention* to purchase Schaller's DBS assets, Golden Sky contends that it is relying on a general common law rule, not merely a "New York rule," which bars fraud claims that are duplicative of breach-of-contract claims.

In a surreply brief, Schaller contends that paragraph 7 of its First Amended Complaint alleges the supposedly "newly minted" claim of fraudulent representation of *ability* to perform the transaction, because it alleges that "Golden Sky increased its offer to purchase Schaller's properties . . . representing to Schaller that it was ready, willing and able to do so." This allegation, Schaller contends, was sufficient to put Golden Sky on notice of its fraud claim based on misrepresentation of ability to perform the transaction. Moreover, Schaller contends that a reasonable jury could, on the record evidence it identifies, find that Golden Sky never intended to purchase Schaller's DBS assets and was never able to do so, because Golden Sky could never pay for them; that Golden Sky knew the representations of intention and ability to perform the transaction were false, because Golden Sky knew it could never pay for the assets; and that Schaller detrimentally relied on the misrepresentations at issue. Therefore, Schaller contends that Golden Sky's motion for summary judgment on this claim should be denied.

The court finds that the first issue it must resolve with regard to Schaller's fraudulent misrepresentation claim is not an issue of what reasonable inferences can

be drawn from the record, but exactly what are the alleged misrepresentations upon which the claim is, or can be, based.

### 1. The claim as pleaded and clarified in response to interrogatories

Count I of Schaller's First Amended Complaint contains the following allegations of "representations" on which Schaller's fraudulent misrepresentation claim is based:

7. On May 26, 1999, defendant Golden Sky increased its offer to purchase Schaller's properties to the sum of $11,070,00[0], *representing* to Schaller that it was ready, willing and able to do so.

　　\*　　\*　　\*　　\*　　\*　　\*

12. On or about August 25, 1999, defendant Jo Ellen Linn and others on behalf of Golden Sky *again represented* that Golden Sky would pay $2700 per subscriber for up to 5000 subscribers for a total of $13,500,000, and that the sale would close on September 10, 1999, on which date the purchase price would be wire-transferred to Schaller; that Golden Sky's board of directors would meet on August 26, 1999 to formally approve the purchase; that all the corporate officials for Golden Sky who were to participate in the closing had made reservations to attend the closing in Hawaii on September 10, and that they were ready to go; that there was no disagreement with the price; that Golden Sky intended to keep its word on the price that it had negotiated with Schaller.

13. On or about August 27, 1999, defendant Jo Ellen Linn *represented* that the Board of Directors of Golden Sky had, on August 26, 1999, approved the agreement for the purchase of Schaller's properties for the sum of $13,500,000.

14. On or about August 27, 1999, Schaller sought to obtain a signed offer, but outside counsel for Golden Sky Ed Foster rebuffed Schaller's attempts, *advising* that it was "not a rush today and the parties can sign the agreement next week."

15. On or about September 3, 1999, defendants Jo Ellen Linn and Rodney Weary, along with outside counsel Ed Foster, *represented* to Schaller that the agreement was complete. Defendant Weary said, "Done, it's a deal. I am a man of my word and we intend to pay the price agreed."

On or about the same date, Defendant Jo Ellen Linn again *represented* that the sale had been agreed to and approved by Golden Sky's board of directors on August 26, that the purchase had been approved, and that Golden Sky Systems would consummate the deal on or before October 1, 1999.

First Amended Complaint, ¶¶ 7, 12–15 (emphasis added). The allegations that follow in this count of the First Amended Complaint allege, in entirely conclusory terms, that the "representations" were false and that Schaller was deceived; that the representations were material; that the defendants knew the representations were false; that the defendants intended to deceive Schaller; that Schaller justifiably relied on the truth of the representations; and that the representations were the proximate cause of Schaller's damage, specifically, loss of benefit of the bargain, costs incurred in increasing its subscriber base at defendant's request, attorney's fees, and other costs, fees, and expenses incurred to effect the sale and in foregoing other sale opportunities. *Id.* at ¶¶ 16–22.[9]

---

9. Indeed, were the court presented with a motion to dismiss the fraudulent misrepresentation claim in the First Amended Complaint for failure to state a claim pursuant to Rules

12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, it is almost inconceivable that the claim would not be dismissed in the face of the utter failure to plead fraud with the par-

In an attempt to clarify Schaller's fraud claim, on May 30, 2000, Golden Sky propounded the following interrogatory to Schaller:

6. Identify all false representations on which you base your claims of misrepresentation. For each such representation, identify the person who made the representation, the date and place of the representation, the person to whom the representation was made, all other persons who were present at the time of the representation, and how the representation was false.

*See* Appendix I—Deposition Testimony And Other Lettered Exhibits In Support Of Defendants' Summary Judgment Motion (Defendants' Appendix I), Exhibit K (Plaintiff's Answers To Interrogatories), No. 6. Thus, it is readily apparent that Golden Sky attempted to obtain by propounding an interrogatory the degree of particularity ordinarily required in the pleading of fraud in federal court pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See* FED.R.CIV.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of the mind of a person may be averred generally."); *see also, e.g., Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 832 (N.D.Iowa 2000) (reiterating that pleading the "circumstances constituting fraud" includes pleading " 'such matters as the time, place and content of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby' ") (quoting *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.,* 61 F.3d 639, 644 (8th Cir.1995), in turn quoting *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983)). Such an inquiry is to be applauded, for two reasons. First, it could eliminate the potential prejudice or surprise to the party responding to the fraud claim that might arise from the insertion at some point in the litigation of unexpected and unpleaded allegations of misrepresentations. Second, it could eliminate the delays that might be incurred by a challenge to the adequacy of the plaintiff's pleading of fraud and the plaintiff's

---

ticularity required by Rule 9(b). *See* FED. R.CIV.P. 9(b); *see also, e.g., Wright v. Brooke Group Ltd.,* 114 F.Supp.2d 797, 832 (N.D.Iowa 2000) (reiterating the requirements for pleading fraud pursuant to Rule 9(b)). The First Amended Complaint, unlike the original fraud claim pleaded in the state-court action before removal, was offered as an amendment pursuant to the Federal Rules of Civil Procedure, and therefore is not excused from the requirements for pleading fraud stated in Rule 9(b). *Compare* Order Regarding Defendant's Joint Motion To Dismiss, January 18, 2000 (denying without prejudice the defendants' motion to dismiss the original fraudulent misrepresentation claim pursuant to Rule 9(b) on the ground that the claim had been originally pleaded in Iowa state court and Iowa law does not require that fraud be pleaded with the particularity required by Rule 9(b)). However, the defendants did not move to block the amended fraud claim pursuant to Rule 15 on the ground that it did not comply with Rule 9(b), and therefore was "futile," nor did they move to dismiss the amended fraud claim pursuant to Rule 9(b) when they subsequently moved to dismiss other counts of the First Amended Complaint. There is something counterintuitive about the court being required to consider, on a motion for summary judgment, a claim that it almost undoubtedly would have found insufficiently pleaded on a motion to dismiss. Nevertheless, the matter is currently presented on a summary judgment procedural footing. Thus, the question is whether genuine issues of material fact preclude summary judgment on the claim or whether the defendants are otherwise entitled to summary judgment on the claim as a matter of law. *See* FED.R.CIV.P. 56.

attempt to replead the claim with the requisite particularity.

However, neither of these potential benefits of Golden Sky's attempt to clarify Schaller's fraud claim was realized here. Schaller's answer to this interrogatory concerning the representations on which its fraud claim was based consisted of the following:

ANSWER: On or about June 30, 1999, Golden Sky, by and through defendant Jo Ellen Linn and Laquita Allen, Vice President of Acquisitions for Golden Sky, increased its offer for Schaller's properties to $2700 per subscriber for up to 5000 subscribers for a total of $13,500,000.

On or about August 25, 1999, defendant Jo Ellen Linn and others on behalf of Golden Sky represented that Golden Sky would pay $2700 per subscriber for up to 5000 subscribers for a total of $13,500,000, and that the sale would close on September 10, 1999, on which date the purchase price would be wire-transferred to Schaller; that Golden Sky's board of directors would meet on the [sic] August 26, 1999 to formally approve the purchase; that all the corporate officials for Golden Sky who were to participate in the closing had made reservations to attend the closing in Hawaii on September 10, and that they were ready to go; that there was no disagreement with the price; that Golden Sky intended to keep its word on the price that it had negotiated with Schaller.

On or about August 27, 1999, Schaller sought to obtain a signed offer, but outside counsel for Golden Sky Ed Foster rebuffed Schaller's attempts, advising that it was "not a rush today and the parties can sign the agreement next week."

On or about September 3, 1999, defendants Jo Ellen Linn and Rodney Weary, along with outside counsel Ed Foster, represented to Schaller that the agreement was complete. Defendant Weary said, "Done, it's a deal. I am a man of my word and we intend to pay the price agreed."

On or about that same date, Defendant Jo Ellen Linn again represented that the sale had been agreed to and approved by Golden Sky's board of directors on August 26, that the purchase had been approved, and that Golden Sky Systems would consummate the deal on or before October 1, 1999.

Defendants' Appendix I, Exhibit K (Plaintiff's Answers To Interrogatories), No. 6. Thus, Golden Sky's attempt to obtain a degree of specificity for Schaller's fraud claim approaching what is ordinarily required by Rule 9(b) of the Federal Rules of Civil Procedure was defeated, because Schaller's answer to the interrogatory is substantially unresponsive to Golden Sky's request for details constituting the circumstances of the alleged fraud. *See* Interrogatory No. 6, quoted *supra; and compare* FED.R.CIV.P. 9(b); *Wright,* 114 F.Supp.2d at 832. Moreover, Schaller's response apparently failed to eliminate any surprise to Golden Sky about the nature of Schaller's fraud claims as based on fraudulent misrepresentation of both intention and ability to perform the transaction. However, Golden Sky never moved to compel a more responsive answer to this interrogatory. Therefore, the court must consider whether the First Amended Complaint and Schaller's answer to Golden Sky's interrogatory provided adequate notice that Schaller's fraud claim was based on fraudulent misrepresentation of *ability* to perform the transaction, or whether this specification of fraud is "newly minted," as Golden Sky contends.

As mentioned above, the interrogatory answer provides very little detail in addi-

tion to the pleading of misrepresentations in the First Amended Complaint. *See* First Amended Complaint, ¶¶ 7, 12–15, also quoted *supra, and compare* Defendants' Appendix I, Exhibit K (Plaintiff's Answers To Interrogatories), No. 6, also quoted *supra.* Indeed, the answer to the interrogatory is an almost verbatim restatement of the allegations of the complaint. *See id.* What this answer does reveal is that Schaller, unlike the court, also perceived paragraph 11 of the First Amended Complaint to constitute an allegation of a misrepresentation,' because the first paragraph of the answer to the interrogatory repeats that paragraph of the First Amended Complaint verbatim. Giving paragraph 11 a very liberal reading, the court can acknowledge that an offer to buy assets at some price may, at least implicitly, constitute a representation of intention to pay that price. *See Hinkle v. Cargill, Inc.,* 613 So.2d 1216, 1220 (Ala. 1992) (" 'When a promise is made the promisor expressly or by necessary implication states that he then has a present intention to perform, and if such intention does not actually exist at that time, a false

statement of fact has been made upon which fraud may be predicated.' ") (quoting *Walker v. Woodall,* 288 Ala. 510, 513, 262 So.2d 756, 759 (1972), in turn quoting *Turner v. Biscoe,* 141 Tex. 197, 171 S.W.2d 118, 119 (1943)); *Mid Plains Reeves, Inc. v. Farmland Indus., Inc.,* 768 S.W.2d 318, 322 (Tex.App.—El Paso 1989) ("When a promise is made, the promisor, at least by necessary implication, states that he then has a present intention to perform, and if such intention does not actually exist at that time, a false statement has been made.") (citing *Turner* ); *see also Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 565–66 (Iowa 1987) ("Under Iowa law, a statement of intent to perform a future act is actionable if when made the speaker had an existing intention not to perform.").[10] The court observes, however, that relying on such marginal implications of an offer as constituting a representation of intention to perform the transaction flies in the face of the purposes of the particularity pleading requirements for fraud imposed by Rule 9(b) and applicable case law.

**10.** Similarly, it could be argued that a promise to perform an act at least implicitly is a representation of *ability* to perform that act. However, Schaller never made such an argument and the court is not required to consider arguments not made by the parties. Although Schaller contends that "[t]he record shows that defendants repeatedly promised that there was a deal with Schaller and *that they had the financial ability to fund the Schaller transaction,*" Plaintiff's Amended Resistance at 36–37 (offering the interrogatory response in support of this contention), Schaller offers no explanation of how its interrogatory response supports this contention, nor does Schaller point to any record evidence supporting a contention that Golden Sky repeatedly represented that it had the financial ability to fund the Schaller transaction. Therefore, the court need not consider whether an offer to purchase assets constitutes a representation of ability to perform the transaction.

Also, in the court's view, a statement that more clearly connotes a representation of *ability* to pay can be found in the portion of the interrogatory response and paragraph 12 of the First Amended Complaint alleging that Golden Sky represented that the deal would close on September 10, 1999, on which date "the purchase price [of $13,500,000] would be wire-transferred to Schaller." *See* First Amended Complaint, ¶ 12; Defendants' Appendix I, Exhibit K at 3 (second paragraph of answer to interrogatory number 6). Representation that so large and specific a sum of money will be transferred to the other party on a specified date by a specified means necessarily—not just vaguely—implies *ability* to perform the transfer as specified. However, once again, Schaller did not make any argument that the representation that funds would be wire-transferred on September 10, 1999, was a representation concerning Golden Sky's ability to perform the transaction, and therefore, such an argument is now waived.

Another notable facet of the interrogatory response, however, is that it is *silent* with respect to the allegation in the First Amended Complaint on which Schaller hangs its hat as having given notice that it was asserting a claim of misrepresentation of Golden Sky's *ability* to perform the transaction. *See* Plaintiff's Sur–Reply Brief In Resistance To Motion For Summary Judgment (Plaintiff's Surreply) at 13 ("While defendants claim these fraud claims [based on misrepresentation of ability to perform the transaction] were not pled with sufficient particularity, paragraph 7 of the [First Amended] Complaint clearly states that Golden Sky increased its offer to purchase Schaller's properties ... *representing to Schaller that it was ready, willing and able to do so.*") (emphasis in the original). However, Schaller's statement of paragraph 7 of the First Amended Complaint is not complete. That paragraph, in its entirety, states the following:

> *On May 26, 1999,* defendant Golden Sky increased its offer to purchase Schaller's properties to the sum of $11,070,00[0], representing to Schaller that it was ready, willing and able to do so.

First Amended Complaint, ¶ 7 (emphasis added). Thus, the misrepresentation of ability to perform in paragraph 7 *is specifically restricted to an allegation that the misrepresentation was made on May 26, 1999.* Although Schaller has otherwise failed to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure in its First Amended Complaint offered pursuant to *federal* rules of pleading, where Schaller *has* pleaded details of the "circumstances constituting fraud," *see* FED.R.CIV.P. 9(b), Schaller "is 'limited to the specific allegations pleaded in [its] complaint.' " *Gunderson v. ADM Investor Servs., Inc.,* 85 F.Supp.2d 892, 905 (N.D.Iowa 2000) (quoting *McAnally v. Gildersleeve,* 16 F.3d 1493, 1496 (8th Cir.1994), which in turn cites Rule 9(b) and *Greenwood v. Dittmer,* 776 F.2d 785, 789 (8th Cir.1985)); *North Central F.S., Inc. v. Brown,* 951 F.Supp. 1383, 1408 (N.D.Iowa 1996) (same). Thus, Schaller is limited by its pleadings to an assertion of fraudulent misrepresentation of ability to perform the transaction *made on May 26, 1999.*

The interrogatory response, on the other hand, identifies alleged misrepresentations "on or about" June 30, August 25, August 27, and September 3, 1999, but none on May 26, 1999. *See* Defendants' Appendix I, Exhibit K (Plaintiff's Answers To Interrogatories), No. 6, quoted *supra.* Schaller has never supplemented its response to the interrogatory to amend this omission. Thus, the court concludes that Schaller has waived any assertion of misrepresentations of either *intention* or *ability* to perform the transaction based on the offer made May 26, 1999, or has effectively narrowed its allegations of fraud to exclude allegations arising from the May 26, 1999, offer. *See Bridgeman Art Library, Ltd. v. Corel Corp.,* 25 F.Supp.2d 421, 429 (S.D.N.Y. 1998) ("Bridgeman's answers to defendant's interrogatories substantially narrowed its claims. It specifically asserted that the only basis for its claims of unfair competition and deceptive trade practices was Corel's alleged copying of Bridgeman's images and sales of the copies at lower prices."); *Primes v. Reno,* 999 F.Supp. 1007, 1008 n. 3 (N.D.Ohio 1998) (where the defendants asked the plaintiff to "identify and describe each and every act" of race discrimination and reprisal, the "[p]laintiff's supplemental responses effectively limit[ed] his claims to his 1994 performance appraisal"), *aff'd,* 190 F.3d 765 (6th Cir.1999). *But see Donovan v. Crisostomo,* 689 F.2d 869, 875 (9th Cir. 1982) ("Interrogatories do not supersede or supplement pleadings, nor do they bind parties as an allegation or admission in a

pleading or pre-trial order").[11] Were the court to conclude otherwise, a litigant could "hide the ball" about the nature of his claims or theory of recovery until the summary judgment phase of the proceedings, then produce an entirely new theory of the case, or one the litigant had apparently specifically eschewed—as is the case here—as a basis for denying summary judgment, without affording the opposing party the opportunity to pursue discovery concerning that theory or its factual basis. Permitting such conduct is particularly inappropriate when the claim is fraud-based and the federal rules otherwise require a heightened standard of pleading and limit a party to the specific allegations of fraud the party has pleaded. *See Gunderson*, 85 F.Supp.2d at 905 (citing *McAnally*, 16 F.3d at 1496 (8th Cir.1994), in turn citing Rule 9(b) and *Greenwood*, 776 F.2d at 789); *North Central F.S., Inc.*, 951 F.Supp. at 1408 (same).

Similarly unhelpful to Schaller is its contention that, during the June 30, 1999, meeting, Golden Sky misrepresented its ability to perform the transaction by assuring Schaller, in response to an inquiry from Steven Jensen, that bank financing and compliance with loan covenants was "not an issue." *See* Plaintiff's Amended Resistance at 43–44. This supposed misrepresentation of *ability* to perform was not mentioned in either the First Amended Complaint or Schaller's answer to Golden Sky's interrogatory, and therefore is doubly waived. Nor can this alleged misrepresentation on June 30, 1999, reasonably relate to the pleaded misrepresentation that Golden Sky was "ready, willing, and able" to perform the transaction, because the "ready, willing, and able" misrepresentation was allegedly made on or about May 26, 1999, a full month earlier, with Golden Sky's renewed offer to purchase the assets. Thus, this representation concerning financial ability, made on June 30, 1999, has not been pleaded at all and is not before the court.

Nor can Schaller rely on a "phony" board resolution as presenting the claim that Golden Sky misrepresented its ability to perform the transaction, even though Schaller contends that the "phony" board resolution was "[o]ne of the most blatant frauds committed by Golden Sky." *See* Plaintiff's Amended Resistance at 32. The "phony" board resolution, as characterized by Schaller, consisted of the insertion in the version of the board resolution sent to Schaller of language making board approval of the transaction contingent on financing, when no such contingency is reflected in the minutes of the meeting at which the board passed the resolution. Schaller contends that this "fraud" left Golden Sky a backdoor out of the transaction, because Golden Sky already knew it could not finance the purchase of Schaller's DBS assets at the time Golden Sky's board approved the transaction. *See id.* at 32–36. However, the court reads Schaller's contentions concerning a "phony" board resolution to be arguments that the "phony" resolution is evidence demonstrating Golden Sky's knowledge of its inability to perform the transaction and not as a contention that the "phony" resolution is a separate—again, unpleaded—misrepresentation. As support for a claim based on misrepresentation of ability to perform that has been waived, evidence of the "phony" resolution is irrelevant, and as a

---

**11.** "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir.1996). The court does not see why a response to an interrogatory should be less binding, where "[e]ach interrogatory shall be answered separately and fully in writing under oath" and "signed by the person making them." FED.R.CIV.P. 33(b)(1) & (2).

separate instance of misrepresentation, it is not before the court, because it was never pleaded nor identified in Schaller's response to Golden Sky's interrogatory.

Thus, the court concludes that Schaller's fraudulent misrepresentation claim can be based only on the misrepresentations identified in both its pleadings *and* its interrogatory response, which limits Schaller's fraudulent misrepresentation claim primarily to a contention that Golden Sky misrepresented its *intention* to perform the transaction. *See* Defendants' Appendix I, Exhibit K (Plaintiff's Answers To Interrogatories), No. 6, quoted *supra.*

### 2. Merits of summary judgment on the claim as formulated

Having determined what fraudulent misrepresentations are before the court, the court turns next to the question of whether Golden Sky is entitled to summary judgment on Schaller's allegations of fraud based on those representations. Analysis of that question begins with an examination of the applicable principles of Iowa law.

### a. Fraudulent misrepresentation under Iowa law

 As this court has explained on a number of occasions, "[t]he required elements of fraudulent misrepresentation under Iowa law are: (1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *Wright,* 114 F.Supp.2d at 819 (citing *Doe v. Hartz,* 52 F.Supp.2d 1027, 1055 (N.D.Iowa 1999) (internal quotations and citations omitted)); *Gunderson,* 85 F.Supp.2d at 922 (same); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812 (N.D.Iowa 1997) (same); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F.Supp. 1445, 1473 (N.D.Iowa 1996) (same); *accord Gibson v. ITT Hartford*

*Ins. Co.,* 621 N.W.2d 388, 400 (Iowa 2001) ("To establish a claim of fraudulent misrepresentation, a plaintiff must prove (1) defendant made a representation to the plaintiff, (2) the representation was false; (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in reliance on the truth of the representation and was justified in relying on the representation, (7) the representation was a proximate cause of plaintiff's damages, and (8) the amount of damages."); *In re Marriage of Cutler,* 588 N.W.2d 425, 430 (Iowa 1999) (defining the elements of fraud as including (1) misrepresentation or failure to disclose when under a legal duty to do so, (2) materiality, (3) scienter, (4) intent to deceive, (5) justifiable reliance, and (6) resulting injury or damage). The plaintiff must prove the elements of fraudulent misrepresentation by clear and convincing evidence. *Id.* at 820; *Cutler,* 588 N.W.2d at 430; *see also Ralfs v. Mowry,* 586 N.W.2d 369, 373 (Iowa 1998) (describing the burden as proving the existence of fraud "by clear, satisfactory, and convincing evidence") (citing *Benson v. Richardson,* 537 N.W.2d 748, 756 (Iowa 1995)).

Although Golden Sky admits that it has found no Iowa authority specifically on point, it contends that the general common law rule is that a fraud claim cannot be based on representations that are at the heart of the contract, but instead must be based on "extraneous" promises or representations. Schaller contends, however, that Golden Sky is relying on a "New York rule" with no applicability to a fraudulent misrepresentation claim under Iowa law. This court has previously addressed a similar question, whether Iowa law recognizes a cause of action for fraudulent misrepresentation based on "broken promises":

Iowa has also adopted the rule that broken promises do not generally give rise

to any inference of fraudulent intent at the time the promises were made. *See Magnusson Agency v. Public Entity Nat'l Company–Midwest,* 560 N.W.2d 20, 28–29 (Iowa 1997); *Robinson v. Perpetual Servs. Corp.,* 412 N.W.2d 562, 565–66 (Iowa 1987); *Irons v. Community State Bank,* 461 N.W.2d 849, 854 (Iowa Ct.App.1990). In *Robinson,* which the Producers cite, the Iowa Supreme Court wrote,

> Under Iowa law, a statement of intent to perform a future act is actionable if when made the speaker had an existing intention not to perform. *Hagarty v. Dysart–Geneseo Community School Dist.,* 282 N.W.2d 92, 95 (Iowa 1979); *Grefe v. Ross,* 231 N.W.2d 863, 867 (Iowa 1975). However, in establishing the present intent not to perform, "[t]he fact the agreement was not performed does not alone prove the promissor did not intend keeping it when it was made." *Lamasters v. Springer,* 251 Iowa 69, 74, 99 N.W.2d 300, 303 (1959); *see also Hagarty,* 282 N.W.2d at 95.

*Robinson,* 412 N.W.2d at 565. *See also Magnusson Agency,* 560 N.W.2d at 28–29 ("However, in establishing intent, the fact that an agreement was not performed does not alone prove that the promisor did not intend to keep the promise when it was made," *citing Robinson,* 412 N.W.2d at 565); *Irons,* 461 N.W.2d at 854 ("[W]hen a promise is made by one individual in good faith with the expectation of carrying that promise out, the mere fact the promise was not fulfilled does not, alone, constitute actionable fraud. For the breaking of such a promise to be actionable as fraud, the speaker must have had an existing intent not to perform at the time the promise was made," citing PROSSER, THE LAW OF TORTS § 109, pp. 730–31 (4th ed.1971), and *Robinson,* 412 N.W.2d at 565–66).

Again, there is an exception to this rule, which provides that a claim of promissory fraud may lie if, when the promise was made, the promisor had no intention to perform it. *See Northwest Airlines, Inc.,* 111 F.3d at 1393; *International Travel Arrangers,* 991 F.2d at 1402; *Coenco, Inc.,* 940 F.2d at 1178. *Accord Robinson,* 412 N.W.2d at 565; *Magnusson Agency,* 560 N.W.2d at 28–29; *Irons,* 461 N.W.2d at 854. However, to prevail on such a claim, the plaintiff must present "affirmative evidence" that the promisor had no intention to perform when the promise was made. *Id.; International Travel Arrangers,* 991 F.2d at 1403.

*Brown v. North Central F.S., Inc.,* 987 F.Supp. 1150, 1157 (N.D.Iowa 1997); *see also IBP, Inc. v. FDL Foods, Inc.,* 19 F.Supp.2d 944, 951 (N.D.Iowa 1998) (Melloy, then Chief Judge) ("In Iowa, a statement of intent to perform a future act is actionable if, when the statement is made, the speaker had an existing intent not to perform. *Robinson v. Perpetual Services Corp.,* 412 N.W.2d 562, 565 (Iowa 1987). However, in establishing the present intent not to perform, the mere fact that the parties did not complete the agreement does not prove the promissor did not intend to keep the promise. *Id.*") Thus, Schaller's contention that Iowa law recognizes a fraud claim based on statements of an intention to perform, when the party making the representation in fact has no such intention to perform at the time the statement is made, is at least colorable.

However, the court notes that, in *Robinson,* the representation was extraneous to the terms of the contract, or the fraud claim would have been precluded by an integration clause in the contract. *See Robinson,* 412 N.W.2d at 567; *see also Irons,* 461 N.W.2d at 854 (alleged misrepresentation was based on failure to reveal material information, and thus was extraneous to the contract). Here, the alleged

misrepresentation of intent to perform the contract is precisely the intent to enter into the contract itself, not an extraneous promise.

Nevertheless, the court finds that it need not become embroiled in the parties' dispute over whether or not Schaller's fraudulent misrepresentation claims are duplicative of its breach-of-contract claim for the simple reason that, assuming Schaller's claims can be pursued independently of its breach-of-contract claims, Golden Sky is entitled to summary judgment on those claims.

### b. Misrepresentations of intention to perform

■ First, the court concludes that Golden Sky is entitled to summary judgment on Schaller's claim of fraudulent misrepresentation to the extent the claim is based on misrepresentations of Golden Sky's *intention* to perform the transaction. The claim premised on such misrepresentations fails *ab initio*, because there was no unilateral "promise" by Golden Sky to enter into the contract. *See, e.g., Wright,* 114 F.Supp.2d at 819 (proof of fraud requires a material, false representation); *Robinson,* 412 N.W.2d at 565 ("Under Iowa law, a statement of intent to perform a future act is actionable if when made the speaker had an existing intention not to perform"; thus, there must be such a statement of intent to sustain the claim). Instead, for much the same reason the court concluded that no oral agreement was reached—that is, because Golden Sky's offers included disclaimers that any agreement was contingent upon negotiating a deal involving myriad specified details and reduction of that agreement to a signed writing—the court now concludes that any "promise" or statement of intention to enter into an agreement with Schaller was *also* conditioned on negotiation and execution of a written agreement. Just as Schaller cannot enforce an "agreement to agree" as a contract, Schaller cannot assert a fraud claim based upon statements of "intention" to enter into an agreement that were expressly conditioned upon execution of a written agreement. The court will not allow Schaller another "bite at the apple" to recover for fraud where Schaller could not recover for breach of contract based on the same representation or "misrepresentation" of intention to enter into an agreement, because the representations at issue on both claims were in the context of and conditioned upon certain requirements that were not fulfilled. To put it another way, there can be no "false promise" to enter into the agreement or false statement of intention to enter into the agreement where no promise at all was made to enter into the agreement, except where certain conditions were met, nor any statement of intention not expressly conditioned upon fulfillment of certain requirements. *See Robinson,* 412 N.W.2d at 565 (" 'Unless the present state of mind is misstated, there is of course no misrepresentation.' ") (quoting W. PROSSER, THE LAW OF TORTS § 109, at 730–31 (4th ed.1971)). Thus, the "falsity" element of Schaller's fraudulent misrepresentation claim based on misrepresentation of intention to enter into the agreement cannot be established as a matter of law. *See Wright,* 114 F.Supp.2d at 819 (proof of fraud requires a material, false representation).

### c. Other "misrepresentations"

The court recognizes that Schaller's response to Golden Sky's interrogatory concerning the representations upon which its fraud claim was based includes some other alleged "misrepresentations." However, Schaller itself admits that some of the representations listed in its First Amended Complaint and interrogatory response are true. Hence, those representations also cannot sustain a fraudulent misrepresentation claim. *Id.*

The first such representation is that "Jo Ellen Linn represented that the Board of Directors of Golden Sky had, on August 26, 1999, approved the agreement for the purchase of Schaller's properties for the sum of $13,500,000." First Amended Complaint, ¶ 13; Defendants' Appendix I, Exhibit K at 4 (third paragraph of answer to Interrogatory No. 6).[12] Schaller itself acknowledges that Golden Sky's board of directors *did* approve the agreement to purchase Schaller's DBS assets for the sum of $13,500,000 on August 26, 1999. *See* Defendants' Statement Of Undisputed Facts, ¶¶ 129–130; *see also* Plaintiff's Response To Defendants' Statement Of Undisputed Facts, ¶¶ 129–130. Indeed, Schaller relied on statements that board approval had been obtained, in support of its breach-of-contract claim, as demonstrating that the parties had reached an oral agreement, *see* Plaintiff's Amended Resistance at 16–19, an inference the court concluded above was insupportable. Thus, Schaller itself acknowledges the "truth" of Jo Ellen Linn's alleged representation on August 27, 1999, that the board had approved the transaction. Consequently, there is no genuine issue of material fact on the issue of the "falsity" of this representation, *see, e.g., Wright,* 114 F.Supp.2d at 819 ("falsity" of the representation is an essential element of fraudulent misrepresentation under Iowa law), and Golden Sky is therefore entitled to summary judgment on the fraudulent misrepresentation claim to the extent it relies on this or similar representation. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as

a matter of law"). Schaller also admits the truth of the representation that "all the corporate officials for Golden Sky who were to participate in the closing had made reservations to attend the closing in Hawaii on September 10, and that they were ready to go." *See* First Amended Complaint, ¶ 12; Defendants' Appendix I, Exhibit K at 4 (answer to Interrogatory No. 6). Indeed, Schaller also relied on this fact as evidence demonstrating that Golden Sky believed it had already reached an oral agreement with Schaller, *see* at Plaintiff's Amended Resistance at 20 (citing Plaintiff's Exhibits at 621–22), an inference the court rejected above.

■■■ Similarly, Golden Sky is entitled to summary judgment on the fraud claim to the extent that the claim relies on the falsity of the representation that "the purchase price [of $13,500,000] would be wire-transferred to Schaller." *See* First Amended Complaint, ¶ 12; Defendants' Appendix I, Exhibit K at 3 (second paragraph of answer to interrogatory number 6). As a matter of law, this representation was not "false" where, like the representations of intention to perform the transaction, the transfer of funds was expressly conditioned, by the language of the letters of interest and Letter of Intent, upon the execution of a written agreement. Similarly unsupportable is a fraud claim based on misrepresentations that the parties had no disagreement with the price and that Golden Sky intended to keep its word on the price that it had negotiated with Schaller. *See* First Amended Complaint, ¶ 12; Defendants' Appendix I, Exhibit K at 3 (second paragraph of answer to interrogatory number 6). These representations, again, were not "false," in that they reflected the parties' undisputed agreement on *one* term of the transaction. However,

---

**12.** Similar allegations of misrepresentation by Jo Ellen Linn concerning board approval are also stated in paragraphs 12 and 15 of the First Amended Complaint and are parroted in Schaller's answer to Interrogatory No. 6.

they were representations made in the context of disclaimers of any intention to be bound to the transaction as a whole in the absence of an executed, written agreement.

For a somewhat different reason, Golden Sky is entitled to summary judgment on any portion of the fraudulent misrepresentation claim that is based on Ed Foster's alleged representation in his "rebuffing" of Schaller's attempts to obtain a signed offer and statement that it was "not a rush today and the parties can sign the agreement next week." *See* First Amended Complaint, ¶ 14; Defendants' Appendix I, Exhibit K at 4 (fourth paragraph of answer to Interrogatory No. 6). The court can find no argument anywhere in Schaller's resistance to Golden Sky's motion for summary judgment on its fraudulent misrepresentation claim in support of a contention that this representation satisfies any of the elements of a fraudulent misrepresentation claim. *See* FED.R.CIV.P. 56(e) (the party opposing summary judgment is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka*, 122 F.3d at 562; *McLaughlin*, 50 F.3d at 511; *Beyerbach*, 49 F.3d at 1325. Because Schaller has failed to make the necessary showing on any of the essential elements of fraudulent misrepresentation as to this representation, Golden Sky is "entitled to judgment as a matter of law" on the fraud claim to the extent that the claim relies on this representation. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d at 1492.

Finding that, as a matter of law, there are no "false" representations upon which Schaller can base its fraudulent misrepre-

sentation claim, the court concludes that summary judgment in favor of Golden Sky must also be entered on this claim.

### D. Golden Sky's Counterclaim

Finally, the court turns to that part of Golden Sky's motion seeking summary judgment on its own counterclaim of unjust enrichment. This counterclaim seeks to recover $75,095 for 288 satellite dishes Golden Sky provided to Schaller during the parties' attempts to negotiate the purchase of Schaller's DBS assets by Golden Sky for which Schaller has never paid. In its response to Golden Sky's motion for summary judgment on this counterclaim, Schaller acknowledged its obligation to pay for the satellite dishes. However, relying on this court's decision in *Jones Distributing Company, Inc. v. White Consolidated Industries, Inc.*, 943 F.Supp. 1445 (N.D.Iowa 1996), Schaller contends that judgment should not be entered until the entire case is resolved, so that any amount due Golden Sky could be set off against any damages Golden Sky owed Schaller on its claims. Because the court will enter summary judgment in favor of Golden Sky on Schaller's claims, and Schaller does not contest Golden Sky's counterclaim, it is also proper to enter summary judgment on the counterclaim in favor of Golden Sky at this time.

### III. CONCLUSION

Summary judgment in favor of Golden Sky is appropriate on Schaller's remaining claims of breach of contract and fraudulent misrepresentation, as well as on Golden Sky's counterclaim of unjust enrichment. As to Schaller's breach-of-contract claim, no reasonable jury could find that an enforceable oral contract was reached in the face of Golden Sky's repeated "umbrella" disclaimers, for example, in Golden Sky's letters of interest and Letter of Intent, that no agreement would be binding in the absence of the execution of a written

agreement. In the parlance of the parties, this is a "Comment *b* case," in that the undisputed evidence establishes that Schaller "kn[ew] or ha[d] reason to know that [Golden Sky] ... intend[ed] that no obligation shall exist until ... the whole [agreement] ha[d] been reduced to another written form." RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. b. Thus, "the preliminary negotiations and agreements" reached by the parties "do not constitute a contract." *Id.*

As to the fraudulent misrepresentation claim, Schaller waived any claim based upon misrepresentation of Golden Sky's *ability* to perform the transaction by not including such an allegation, however vaguely asserted in the First Amended Complaint, in its response to Golden Sky's interrogatory concerning particulars of Schaller's fraud claim. For much the same reason that the "umbrella" disclaimers in Golden Sky's offers to purchase Schaller's DBS assets bar an enforceable oral contract, those disclaimers also require summary judgment in favor of Golden Sky on Schaller's claim based on misrepresentation of Golden Sky's *intention* to perform the transaction. No "false promise" to enter into the transaction could be made where any statement of intention to enter into the transaction was subject to disclaimers that no agreement would be binding in the absence of an executed, written agreement. Assertion of the fraudulent misrepresentation claim on the basis of other representations identified in both the First Amended Complaint and response to Golden Sky's interrogatory also founders on the "truth" of those statements.

Finally, summary judgment is appropriate on Golden Sky's counterclaim for unjust enrichment, because Schaller acknowl-

edges its obligation to pay for the satellite dishes at issue, and there is no reason to defer entry of judgment where no other claims will proceed to trial.

THEREFORE, Golden Sky's motion for summary judgment is granted in its entirety. **Judgment shall enter**

1. **in favor of defendant Golden Sky and against plaintiff Schaller on Schaller's claims of fraudulent misrepresentation and breach of contract,** Counts I and IV of the First Amended Complaint, respectively.[13]

2. **in favor of defendant Golden Sky and against plaintiff Schaller in the amount of $75,095 on Golden Sky's Counterclaim of unjust enrichment.**

**IT IS SO ORDERED.**

---

**13.** Counts II and III of the First Amended Complaint were previously dismissed for failure to state claims upon which relief can be

granted and Count IV was previously dismissed as to individual defendants Rodney A. Weary and Jo Ellen Linn.